UNITED MAGAZINE COMPANY, the Stoll Companies, Michiana News Service, Inc., Geo. R. Klein News Co., Central News Company, and the Scherer Companies, Plaintiffs,

v.

MURDOCH MAGAZINES DISTRIBUTION, INC., TV Guide Distribution, Inc., Curtis Circulation Company, Comag Marketing Group, LLC, Hearst Distribution Group, Inc., Kable News Company, Inc., Time Distribution Services, Inc., Warner Publisher Services, Inc., and Chas. Levy Circulating Co., Defendants.

No. 00 Civ. 3367(AGS).

United States District Court,
S.D. New York.

May 31, 2001.

Carl E. Person, New York City, for Plaintiffs.

Philip G. Barber, Constantine & Partners, P.C., New York City, for Defendants Murdoch Magazines Distribution, Inc. and TV Guide Distribution, Inc.

George G. Gordon, Dechert Price & Rhoads, New York City, for Defendant Curtis Circulation Company.

Lawrence I. Fox, McDermott, Will & Emery, New York City, for Defendants Comag Marketing Group, LLC and Hearst Distribution Group, Inc.

I. Michael Bayda, Jacobs Persinger & Parker, New York City, for Defendant Kable News Company, Inc.

Irving Scher, Weil, Gotshal & Manges LLP, New York City, for Defendants Time Distribution Services, Inc. and Warner Publisher Services, Inc.

Richard L. Fenton, Sonnenschein Nath & Rosenthal, New York City, for Defendant Chas. Levy Circulating Co.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiffs, related companies in the magazine and book wholesale business, allege that defendants, a wholesaler and various magazine and book distributors, have violated antitrust laws, breached certain contracts, and committed certain torts. The wholesaler, defendant Chas. Levy Circulating Co. ("Levy"), and the distributor de-

fendants (collectively the "Distributors") each move, pursuant to Rule 12(b)(6), to dismiss the claims against them respectively in the Amended Complaint. For the reasons set forth below, defendants' motions are granted.

## I. THE PARTIES

Plaintiff United Magazine Company ("Unimag") is an Ohio corporation with its principal place of business in Ohio. (Am. Compl.¶ 6.) Unimag directly or indirectly owns all of the stock of each of the other plaintiffs. (*Id.*) Plaintiff The Stoll Companies ("Stoll") is an Ohio corporation with its principal place of business in Ohio. (*Id.* ¶ 9.) Plaintiff Michiana News Service, Inc. ("Michiana") is a Michigan corporation with its principal place of business in Ohio. (*Id.* ¶ 11.) Plaintiff Geo. R. Klein News Co. ("Klein") is an Ohio corporation with its principal place of business in Ohio. (*Id.* ¶ 13.) Plaintiff Central News Company ("Central") is an Ohio corporation with its principal place of business in Ohio. (*Id.* ¶ 15.) Plaintiff The Scherer Companies ("Scherer") is a Delaware corporation with its principal place of business in Ohio. (*Id.* ¶ 19.)

Defendant Murdoch Magazines Distribution, Inc. and defendant TV Guide Distribution, Inc. (together "Murdoch") are Delaware corporations with their principal places of business in New York. (*Id.* ¶¶ 24–25.) Defendant Curtis Circulation Company ("Curtis") is a Delaware corporation with its principal place of business in New Jersey. (*Id.* ¶ 26.) Defendant Hearst Distribution, Inc. and defendant Comag Marketing Group, LLC (together "Hearst") are Delaware corporations with their principal places of business in New York. (*Id.* ¶¶ 27–28.) Defendant Kable News Company, Inc. ("Kable") is an Illinois corporation with its principal place of business in New York. (*Id.* ¶ 29.) Defendant Time Distribution Services, Inc. ("Time") is a Delaware corporation with its principal place of business in New York. (*Id.* ¶ 30.) Defendant Warner Publisher Services, Inc. ("Warner") is a New York corporation with its principal place of business in New York. (*Id.* ¶ 31.) (Time and Warner will hereinafter together be referred to as "Time Warner."[1]) Defendant Levy is an Illinois partnership with its principal place of business in Illinois. (*Id.* ¶ 34.)

## II. BACKGROUND

The facts set forth below are taken from the Amended Complaint. All of the parties herein are involved in the magazine and book distribution industry, the structure of which forms the factual background of this action. Each magazine or book (together "publication") is published by a specific publisher. (*E.g.* Time–Warner, Inc. publishes *Time.*) (Am.Compl.¶ 38.I.) Each publisher then sells specific publication titles to a particular distributor. Commonly, publication titles are available from only one distributor. (*E.g. TV Guide* is only available from Murdoch.) (Am. Compl.¶¶ 38.G, 46.) Distributors then resell the publications to wholesalers at a discount off of the cover price. (*Id.* ¶ 52.) Distributors determine the wholesalers to which titles will be sold, and in what quantity. (*Id.* ¶ 46.) Wholesalers, in turn, resell the publications to retailers at a smaller discount off the cover price than the wholesalers receive from the distributors. (*Id.* ¶ 52.) Wholesalers are responsible, at their own expense, for allocating the publications among retailers, physically distributing the publications to retail locations, and arranging the publications in display racks. (*Id.* ¶¶ 47–48.) Retailers

---

**1.** Time and Warner are both alleged to be subsidiaries of the corporation now known as AOL Time Warner. (Am.Compl.¶¶ 30, 31, 38.G.5, 38.I.)

then sell the publications to consumers at the cover price. (*Id.* ¶ 52.)

Any publications unsold at the end of their respective shelf lives are removed from retail locations by the wholesalers, at the wholesalers' expense. The wholesalers are then responsible for disposing of the unsold publications and certifying such disposal to the distributors. Certification may entail removing the cover of each unsold publication and shipping the covers back to the particular distributor, or scanning the UPC codes on the unsold publications and sending the distributor an affidavit stating that the wholesaler disposed of the particular publications properly. (*Id.* ¶¶ 48–49.) Unsold publications also generate credits back along the chain of sale. That is, retailers receive credits from wholesalers for each unsold publication; wholesalers receive credits from distributors; and distributors receive credits from publishers. (*Id.* ¶¶ 50, 52.) Under this system, distributors have a financial incentive to distribute as many copies of the publications as possible because they receive full credit for unsold publications that they purchased and are not responsible for the costs of physical distribution. (*Id.* ¶ 53.)

Historically, each wholesaler was granted one or more exclusive geographic territories in which it alone sold publications to retailers. Any retailer in a given area could purchase publications only from the single wholesaler with rights to that area. (*Id.* ¶¶ 44, 56–60.) Under this system, wholesalers could operate profitably because any losses incurred supplying smaller, less-profitable retailers were compensated for by profits made on larger, more-profitable retailers. Over the last fifty years, the number of both distributors and wholesalers has decreased, as distributors purchased other distributors and wholesalers purchased other wholesalers.

(*Id.* ¶ 45.) For example, during this period Unimag acquired Stoll, Michiana, Klein, and Central. (*Id.* ¶¶ 9, 11, 13, 15.) Beginning in 1995, one or more of the Distributors began permitting some wholesalers to sell magazines and books to certain large retailers without regard for exclusive geographic territories. (*Id.* ¶ 62.) Under the new system, wholesalers were permitted to bid for the right to sell to a given large retailer in multiple territories. (*Id.* ¶¶ 63–64.) This change was apparently driven by the large retailers, who preferred to purchase all of their publications from one wholesaler, rather than having to make purchases from a different wholesaler in each geographic area. (*Id.* ¶ 63.)

From 1938 through late 1995, Stoll had exclusive territories in northern Ohio, southern Michigan, and eastern Indiana. (*Id.* ¶ 103.) From 1971 through late 1995, Michiana had exclusive territories in southwestern Michigan, Indiana, and northwestern Ohio. (*Id.* ¶ 104.) From 1958 through late 1995, Klein had exclusive territories in northern and northeastern Ohio. (*Id.* ¶ 105.) From 1959 through late 1995, Central had exclusive territories in northern Ohio, West Virginia, and Pennsylvania. (*Id.* ¶ 106.) Service News Company d/b/a Yankee News Company, had exclusive territories in Connecticut and New York from 1958 until its merger into Unimag in 1998. (*Id.* ¶¶ 21, 107.) From 1988 through late 1995, Unimag had exclusive territories in Connecticut, New York, North Carolina, South Carolina, and Pennsylvania. (*Id.* ¶ 108.) Scherer did not itself operate as a wholesaler of books and magazines. Instead, Scherer provided management services and computer hardware, software, and technical support to the other plaintiffs. (Am.Compl.¶ 20.) As of late 1995, Levy had exclusive territories in Illinois, Indiana, Michigan, Pennsylvania, and Wisconsin. (*Id.* ¶ 112.)

Sometime between 1995 and 1999, defendant Levy began selling to one or more large retailers in one or more of the plaintiffs' previously exclusive territories. (*Id.* ¶ 76.) The Distributors enabled Levy to do this by providing Levy with extra copies of magazines and books, as well as with various discounts. These discounts were not provided to plaintiffs. (*Id.* ¶¶ 63, 67, 74.) As a result, plaintiffs were left with only smaller, less-profitable retailers, and so had difficulty maintaining sufficient revenues to continue to operate. (*Id.* ¶¶ 73, 93.) In late 1998, Levy negotiated to acquire the assets of plaintiffs. (*Id.* ¶ 115.) These negotiations culminated in an executed asset purchase agreement dated March 18, 1999 (the "Purchase Agreement"). Plaintiffs and Levy never closed on the asset purchase transaction, however. Plaintiffs allege that they were "forced" to cease doing business in September 1999. (*Id.* ¶ 93.) Plaintiffs filed this action on May 3, 2000. Murdoch moved to dismiss the complaint on July 20, 2000. In response, plaintiffs filed the Amended Complaint on August 31, 2000. All defendants then filed the instant motions to dismiss the Amended Complaint. The Court heard oral argument on the motions on May 1, 2001.

## III. MOTION TO DISMISS STANDARD

A court may not dismiss a complaint pursuant to Rule 12 unless, even when the complaint is liberally construed, it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997). On a motion to dismiss, a court must accept as true all of the facts alleged in the complaint. *Id.* A court must also must draw all reasonable inferences in the light most favorable to the plaintiff. *Id.* In antitrust cases, as in other types of cases, all that is

required is a "short plain statement of a claim for relief which gives notice to the opposing party." *Global Disc. Travel Servs. v. Trans World Airlines*, 960 F.Supp. 701 (S.D.N.Y.1997). "This does not mean that 'conclusory allegations which merely recite the litany of antitrust ... will suffice.'" *Id.* (quoting *John's Insulation, Inc. v. Siska Constr. Co.*, 774 F.Supp. 156, 163 (S.D.N.Y.1991)).

## IV. PLAINTIFFS' ANTITRUST CLAIMS

Plaintiffs' Amended Complaint includes fifteen counts, some of which contain more than one cause of action. In this section, the Court addresses the three counts that implicate antitrust law, both federal and state. The remaining counts will be addressed in the following section.

### A. Robinson–Patman Act (Count I)

Plaintiffs allege three separate causes of action under the Robinson–Patman Act, 15 U.S.C. § 13 *et seq.* First, that the Distributors violated section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), by selling goods to Levy at a lower price than they charged plaintiffs. Second, that all of the defendants violated section 2(c) of the Robinson–Patman Act, 15 U.S.C. § 13(c), by the Distributors paying, and Levy receiving, discounts disguised as brokerage fees or discounts that constituted commercial bribes. Third, that Levy violated section 2(f) of the Robinson–Patman Act, 15 U.S.C. § 13(f), by receiving discriminatorily lower prices for goods. The Court will address each cause of action in turn.

#### 1. Section 2(a)

Plaintiffs allege that the Distributors sold publications to Levy at a lower price than the Distributors sold publications to plaintiffs, thereby harming plain-

tiffs, in violation of section 2(a). (Am. Compl.¶¶ 66–84.) The Distributors argue that plaintiffs have failed to adequately allege all of the elements of a section 2(a) claim. (Joint Mem. of Law of the National Distributor Defs. in Supp. of Their Mot. to Dismiss Pls.' Am. Compl. Pursuant to Fed.R.Civ.P. 12(b)(6) ("Distributors' Mem.") at 3–8.) The Court finds that plaintiffs have not adequately alleged two elements of their section 2(a) claim. Section 2(a) prohibits discriminatory pricing among competing buyers of the same goods. 15 U.S.C. § 13(a). To state a claim for secondary-line price discrimination under section 2(a),[2] a plaintiff must allege that: (i) the seller made sales in interstate commerce; (ii) the seller discriminated in price between two buyers; (iii) the product sold to both purchasers was the same grade and quality; and (iv) the price discrimination had an unlawful effect on competition. *George Haug Co. v. Rolls Royce Motor Cars, Inc.*, 148 F.3d 136, 141 (2d Cir.1998). In order to establish an unlawful effect on competition, a plaintiff must allege that it was actually competing with the favored purchaser at the time of the price discrimination. *Id.; Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 584–85 (2d Cir.1987). An allegation of actual competition at the time of the price discrimination, and of a price discrimination that was sub-

stantial and sustained over time, will satisfy the fourth element of a section 2(a) claim. *George Haug*, 148 F.3d at 142–44.

The first two elements of the section 2(a) claim are adequately pled here. The Distributors do not dispute that plaintiffs have alleged the first element, the sale of goods or commodities in interstate commerce. The Distributors argue that plaintiffs have not pled the second element, price discrimination between favored and disfavored buyers, because the plaintiffs have not alleged competition between plaintiffs and Levy at the time when, and in the geographic markets where, any price discrimination occurred. (Distributors' Mem. at 5–6.) This argument addresses not the second element of a section 2(a) claim, but the fourth. All that is required for the second element is an allegation of discrimination by the seller between two buyers. *George Haug*, 148 F.3d at 136. Plaintiffs allege that Levy purchased publications from the Distributors at a unit price per publication lower than the unit price plaintiffs were forced to pay the Distributors. (Am.Compl.¶ 67.) This allegation is sufficient to satisfy the second element.[3]

■ The third element of plaintiffs' section 2(a) claim is a closer question. The Distributors argue that plaintiffs have not

---

**2.** Secondary-line price discrimination occurs where, as is alleged here, the seller's discrimination affects competition between the seller's customers. *See George Haug*, 148 F.3d at 141 n. 2.

**3.** The Court notes that Scherer did not buy publications; Scherer was not a wholesaler. It is difficult to see, then, how Scherer suffered from any price discrimination. The Court does not now consider it necessary to address Scherer's standing to allege this or any other cause of action because the Court is dismissing all of plaintiffs' claims for other reasons. However, if plaintiffs file a second amended complaint, pursuant to Section VI,

*infra*, they must make certain, consistent with their obligations under Fed.R.Civ.P. 11, that each plaintiff has standing to assert each cause of action against each defendant. Plaintiffs must also make certain, consistent with Rule 11, that each of them has a good faith basis in fact and law to assert each cause of action against each defendant. Plaintiffs, six separate legal entities, may not simply assume that the ability of any one of them to assert a given cause of action against any one of the defendants gives all of them the ability to assert that cause of action against all defendants.

adequately alleged the third element because they have not pled that Levy and the plaintiffs purchased products of the same grade and quality. (Distributors' Mem. at 6–7.) Plaintiffs allege that they paid a higher price than did Levy "for the same Magazine or Book from the same seller." (Am.Compl.¶ 67.) As defendants point out, however, this allegation is made problematic by plaintiffs' defined terms. "Magazines and Books" is defined as "the lines of mass-market magazine titles, newspapers, other periodicals and paperback book titles published by the Publishers and distributed by the [Distributors] to Wholesalers or directly to Major Retailers in the United States." (Am.Compl.¶ 38.E.) Of course, if certain periodicals were sold directly to retailers, and not to wholesalers, they may not form the basis of plaintiffs' Robinson–Patman claims. Also, the "Publishers" are alleged to publish only magazines; accordingly, "Magazines and Books" actually includes no books, newspapers, or "other periodicals" other than magazines. (Am.Compl.¶ 38.I.) Further, plaintiffs argue in their memorandum that, contrary to what is alleged in the Amended Complaint, the products at issue are "the 38 supertitle Magazines." (Pls.' Mem. in Opp. to the Nation Distributor Defs.' Mot to Dismiss Pls.' Am. Compl. Pursuant to Fed.R.Civ.P. 12(b)(6) ("Pls.' Distributor Mem.") at 8.) "Supertitle" is an undefined term that apparently refers to the most popular magazines. "Magazines and Books" by its definition, however, does not refer to certain supertitles. For example, *Shape* is allegedly a "supertitle." (Am. Compl. ¶ 38.G.4.) However, *Shape* is not within the category of "Magazines and Books" because it is not published by one of the "Publishers." (Am.Compl.¶ 38.I.) Thus, Kable's sale of *Shape* is not alleged to be a basis for the section 2(a) claim. Plaintiffs do not clearly allege that Kable distributes magazines and books other than *Shape*, or that Levy and any particular plaintiff was charged different prices for whatever magazines Kable does distribute. Even under notice pleading, plaintiffs' conclusory allegation, combined with their unclear and inconsistent definitions of terms, does not afford Kable proper notice of how it has allegedly violated the Robinson–Patman Act. Similarly, plaintiffs' conclusory allegations and problematic definitions fail to give adequate notice to the other Distributors. That is not to say that plaintiffs must allege the exact price paid by each of them and by Levy for each specific title, or otherwise plead all of their evidence. However, absent clearer notice than they have provided in the Amended Complaint, plaintiffs have failed to adequately allege the third element of their section 2(a) claim.

Plaintiffs also do not adequately allege the fourth element of their claim. As noted above, the Distributors argue that there is no sufficient allegation of actual competition between plaintiffs and Levy at the time when, and in the place where, any price discrimination occurred. The Distributors also argue that, even if there was competition and price discrimination, any such price discrimination was not sustained over a long enough period of time to establish harm to competition. (Distributors' Mem. at 5–6, 8.) Plaintiffs initially allege that, "[s]tarting in 1995, some of the [Distributors] permitted some Wholesalers to supply Magazines and Books to retail locations of Major Retailers without regard to the exclusive geographic areas." (Am.Compl.¶ 62.) This allegation is insufficient to meet the requirement that there have been competition between any of the plaintiffs and Levy. Plaintiffs later allege that during the period from May 1996 to May 2000, "plaintiffs have been in competition with Levy and other Wholesalers ... for sales of Magazines and Books to some

of plaintiffs' Major Retailer customers and prospective customers in the 11–state territory serviced by plaintiffs...." (Am. Compl.¶ 76.) While an improvement over the first allegation, this allegation is still insufficient. First, it is not clear from this allegation if any competition was with Levy or a non-party wholesaler. Second, as noted above, plaintiffs may not treat six separate entities as if they were one. Each of the five wholesaler plaintiffs had a distinct territory or territories. *See supra* p. 5. It is unclear from the Amended Complaint as to which plaintiffs faced competition from which of the wholesalers in which territories for sales of the same commodities. Plaintiffs may not state a claim by glossing over these factual requisites with a conclusory allegation of competition. Moreover, there is no clear link between the timing and location of any competition and the timing and location of the alleged price discrimination. To state a claim, each plaintiff must allege that there was price discrimination between it and Levy during the time, and in the place, where that plaintiff and Levy competed for the sale of the same goods. Because plaintiffs have not done this, they have not adequately alleged a claim under section 2(a). Accordingly, the Court dismisses this cause of action.

### 2. Section 2(c)

■ Plaintiffs allege that the defendants violated section 2(c) of the Robinson–Patman Act by arranging for Levy to receive various payments and discounts that amounted to sham brokerage fees and commercial bribes. (Am.Compl.¶¶ 66–84.) The defendants argue that plaintiffs have not sufficiently alleged sham brokerage fees or commercial bribery. (Distributors' Mem. at 4 n. 3; Defendant Chas. Levy Circulating Co.'s Mem. of Law in Supp. of its Mot. to Dismiss Pls.' Am. Compl. Pursuant to Rule 12(b)(6) ("Levy's Mem.") at 7–9; Joint Reply Mem. of Law of the National Distributor Defs. in Further Support of Their Mot. to Dismiss Pls.' Am. Compl. Pursuant to Fed.R.Civ.P. 12(b)(6) at 3–4; Def. Chas. Levy Circulating Co.'s Reply Mem. of Law in Supp. of its Mot. to Dismiss Pls.' Am. Compl. Pursuant to Rule 12(b)(6) at 4–5.) The Court finds that plaintiffs have not adequately alleged all of the elements of a claim under section 2(c). Section 2(c) prohibits sham brokerage fees, that is, price concessions disguised as payments to alleged brokers who do no brokerage work but simply turn the payments over to buyers. 15 U.S.C. § 13(c); *Federal Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 169, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). Some courts have also construed section 2(c) to prohibit commercial bribery, although this is not a settled question in the Second Circuit. *Compare, e.g., Philip Morris, Inc. v. Grinnell Lithographic Co.,* 67 F.Supp.2d 126 (E.D.N.Y.1999) (prohibits bribery) *with Intimate Bookshop, Inc. v. Barnes and Noble, Inc.,* 88 F.Supp.2d 133 (S.D.N.Y. 2000) (applies only to brokerage fees).

Plaintiffs' claim of a violation of section 2(c) apparently rests entirely upon the allegations in one paragraph of the Amended Complaint, which alleges:

Upon information and belief, the [Distributors] offered and/or Levy and Hudson News solicited, induced and knowingly received on its [sic] Magazine and Book purchases from the [Distributors] and from the Publishers the following secret Discounts, Rebates and Deductions knowing that they were not being offered or made available to plaintiffs and that such Discounts, Rebates and Deductions were in violation of the Robinson–Patman Act:

\*　　\*　　\*　　\*　　\*　　\*

(r) upon information and belief, Murdoch and the other [Distributors] arranged for additional discounts and payments to or for the benefit of Levy:

(1) from Publishers of supertitles being distributed by the respective [Distributors] and other Publishers, given directly to Levy

(2) from said Publishers and the [Distributors], given indirectly to Levy through payments to Levy Trucking Company, Levy Book Company or other Levy affiliates; and

(3) from brokers or other third persons as brokerage fees or similar payments;

in violation of paragraph 2(c) of the Robinson–Patman Act.

(Am.Compl.¶ 74(r).) Subparagraph (3) is conclusory, devoid of facts, and fails to state a claim under section 2(c) of the Robinson–Patman Act. Subparagraphs (1) and (2) are insufficient to allege sham brokerage fees. "The fact that a direct payment or indirect discount passes from one party to another party does not compel the conclusion that the payment or discount violates Section 2(c)." *Intimate Bookshop,* 88 F.Supp.2d at 140. Yet subparagraphs (1) and (2) allege nothing more. "In order to make out a *prima facie* Section 2(c) claim, a plaintiff must specifically plead that the payment or discount is in lieu of a brokerage [fee], which the Federal Trade Commission and courts have defined as a reduced or eliminated brokerage." *Id.* Plaintiffs do not make this required pleading. The only mention of brokerage is the conclusory statement in subparagraph (3). It is not possible to conclude from the Amended Complaint that the payments described were not genuine brokerage fees "for services rendered in connection with the sale or purchase of goods," as the Robinson–Patman Act permits. 15 U.S.C. § 13(c).

▇ As for commercial bribery, assuming *arguendo* that it is prohibited under section 2(c), plaintiffs have failed to state a claim. To the extent that section 2(c) prohibits bribery, it prohibits "cases of commercial bribery involving a breach of a fiduciary duty by the buyer's agent." *Grinnell,* 67 F.Supp.2d at 131. For example, the plaintiff in *Grinnell* alleged that the defendants bribed plaintiff's purchasing manager to buy lithographic services from defendants rather than from defendants' less expensive competitors. *Id.* at 128. Plaintiffs here allege nothing of the sort; they allege only payments to Levy or its affiliates. The allegation that a discount or payment passed from one business to another does not implicate bribery involving a breach of fiduciary duty. Thus, even if it is possible to state a claim for commercial bribery under section 2(c), plaintiffs have not done so. Accordingly, plaintiffs' causes of action under section 2(c) are dismissed.

#### 3. Section 2(f)

Plaintiffs allege that Levy violated section 2(f) by knowingly receiving discriminatory prices in violation of other sections of the Robinson–Patman Act. Section 2(f) provides that, "[i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f). Because the Court has already dismissed plaintiffs' other causes of action under the Robinson–Patman Act, there remains no allegation of any prohibited price discrimination that Levy could have received. Accordingly, this cause of action is dismissed.

### B. Tying (Count XII)

Plaintiffs allege that the Distributors have each engaged in unlawful tying (also

referred to as "full-line forcing") in violation of the Sherman Act, 15 U.S.C. §§ 1, 2, New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, and Ohio's Valentine Act, Ohio Rev.Code Ann. § 1331.01 *et seq.*[4] Specifically, plaintiffs allege that the Distributors required that wholesalers who wished to purchase a quantity of supertitles also purchase other titles sold by the Distributors and unwanted quantities of all titles. (Am. Compl.¶¶ 267–268, 270.) Plaintiffs assert that, if given a choice, they would not have purchased the titles other than the supertitles nor the extra copies of any of the titles. (Am. Compl. ¶ 266; Pls.' Distributor Mem. at 26–27.)

■ As an initial matter, this Court has previously observed that, "[a]s a prerequisite to any antitrust claim, plaintiff must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Carell v. Shubert Org., Inc.,* 104 F.Supp.2d 236, 264 (S.D.N.Y.2000) (internal quotations omitted). A relevant product market must include all reasonably interchangeable products. This requires consideration of cross-elasticity of demand. *Id.* "A plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal." *Id.* (quoting *Global,* 960 F.Supp. at 705) (internal quotations omitted).

■ Here, plaintiffs allege that "[t]he relevant product market is each of the supertitles distributed by the [Distributors], and the relevant product/service market of distribution of the supertitles...." (Am.Compl.¶ 262.) This is an inadequate market allegation. The Amended Complaint fails to make reference to the rule of reasonable interchangeability; it does not expressly define the term "supertitles," let alone assert a rational explanation of why the relevant markets should be restricted to individual supertitles, or even supertitles as a whole. Indeed, with the exception of *TV Guide* (Am.Compl.¶ 269), plaintiffs do not even attempt to allege the absence of cross-elasticity of demand. "Courts in this [D]istrict have rejected the proposition that allegedly unique products, by virtue of customer preference for that product, are markets unto themselves." *Carell,* 104 F.Supp.2d at 265 (market was products related to Broadway shows, not just products related to *Cats* ) (internal quotations omitted); *Global,* 960 F.Supp. at 704–05 (market was tickets on all airlines, not just tickets on TWA); *Theatre Party Assocs., Inc. v. Shubert Org., Inc.,* 695 F.Supp. 150, 154 (S.D.N.Y.1988) (market was Broadway shows, not just *Phantom of the Opera);* *Frito–Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1137 (S.D.N.Y.1986) (market was all salty snacks, not just corn chips); *Shaw v. Rolex Watch, USA, Inc.,* 673 F.Supp. 674, 679 (S.D.N.Y.1987) (market was high quality watches, not just Rolex watches).

It is true that the Supreme Court recognized markets for a single brand in *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). That case is distinguishable, however, because it involved circumstances not present here. There, the relevant markets were for parts and services for Kodak photocopiers and micrographic equipment. These photocopiers and other machines were expensive to pur-

---

4. Claims under the Donnelly Act and the Valentine Act are analyzed in the same manner as claims under the Sherman Act. *Cancall PCS, LLC v. Omnipoint Corp.,* No. 99 Civ. 3395(AGS), 2000 WL 272309, at *12 (S.D.N.Y. Mar. 10, 2000) (hereinafter *"Cancall I"* ) (Donnelly Act); *Reddy v. Good Samaritan Hosp. and Health Ctr.,* 137 F.Supp.2d 948, 977 n. 29 (S.D.Ohio Sept. 19, 2000) (Valentine Act).

chase, but had little resale value. Once a customer purchased these machines, it was locked into Kodak parts and service because the hardware and software for those machines was incompatible with equivalent machines made by Kodak's competitors, and *vice-versa.* 504 U.S. at 456–57, 112 S.Ct. 2072. In these circumstances, the Supreme Court recognized that parts for Kodak machines were a market unto themselves because there were no reasonably available substitutes, and owners of Kodak machines could not practically replace the machines once they had purchased them. 504 U.S. at 481–82, 112 S.Ct. 2072. Here, the market is for magazines, reasonably inexpensive publications that inherently become outdated within weeks or months. Buying one issue of a particular magazine from a retailer does not in any way lock the customer into that title. *See Global,* 960 F.Supp. at 705 (consumers not "locked into" airline, soft drink, or television network). Additionally, plaintiffs allege no lack of readily available substitutes for the supertitles. For example, a customer dissatisfied with *Time* could easily switch the next week to *Newsweek, U.S. News & World Report,* or a number of other news magazines. Neither supertitles nor wholesale sales of supertitles constitute a separate market. Accordingly, plaintiffs have failed to properly allege a relevant product market and their tying claim must be dismissed for that reason.

■ Even if the plaintiffs had properly alleged a relevant product market, however, the Court would be compelled to dismiss this cause of action for failure to state a claim for tying. "A tying arrangement is an agreement by a party to sell one prod-uct but only on the condition that the buyer also purchases a different (or tied) product." *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56 (2d Cir.1980) (internal quotations omitted). The Second Circuit recently reiterated the elements of a claim for tying that is *per se* unlawful under the federal antitrust statutes, stating:

> [a]s to the detailed requirements to state a tying claim—
>
> We have required allegations and proof of five specific elements before finding a tie illegal: first, a tying and a tied product; second, evidence of actual coercion by the seller that forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, the involvement of a "not insubstantial" amount of interstate commerce in the "tied" market.

*Hack v. President and Fellows of Yale Coll.,* 237 F.3d 81 (2d Cir.2000).[5]

Plaintiffs contend that each magazine title, in any quantity, is available from only one distributor. (Am. Compl. ¶¶ 38.G, 46; Pls.' Distributor Mem. at 25–26.) Accordingly, no competing distributor of the tied products is being prevented from selling the tied products to wholesalers; there are no competing distributors of the tied products. Therefore, there can be no anticompetitive effects in the tied markets. *See Coniglio v. Highwood Servs., Inc.,* 495 F.2d 1286, 1291–92 (2d Cir.1974) (plaintiff's allegation that Buffalo Bills football team unlawfully tied regular season tickets and preseason tickets failed because all Bills tickets only available from the Bills); *Can-*

---

**5.** One district court in this Circuit has observed that courts have not uniformly held that the fourth element, anticompetitive effect in the tied market, is required. *See Audell Petroleum Corp. v. Suburban Paraco Corp.,* 903 F.Supp. 364, 368 n. 3, 370 (E.D.N.Y.1995). Given the Second Circuit's decision in *Hack,* this Court deems that it must apply all five elements.

*call PCS LLC v. Omnipoint Corp.*, No. 99 Civ. 3395(AGS), 2001 WL 293981, at *4 (S.D.N.Y. Mar. 26, 2001) (hereinafter *"Cancall II"*) (plaintiffs' allegation that defendant Omnipoint unlawfully tied air time on its wireless telephone network and handsets compatible with that network failed because handsets and air time on Omnipoint's network only available from Omnipoint). A required element of the *per se* tying claim is therefore necessarily absent here.

Plaintiffs cannot cure this defect with their contention that, if given a choice, they would not have purchased the non-supertitles nor the extra quantities of any titles. The Supreme Court has ruled that "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). Since plaintiffs claim that the non-supertitles and the surplus copies of all titles were unwanted, and would not have been purchased at all, no competition in the market for those tied products was foreclosed. *See id.; Gonzalez v. St. Margaret's House Dev. Fund.*, 880 F.2d 1514, 1518 (2d Cir. 1989) (doubtful that competition was foreclosed in tied market where, absent compelled link between housing and prepared meals, residents of housing development would probably not have purchased prepared meals at all); *Yentsch*, 630 F.2d at 57–58 (unlikely that there were anticompetitive effects in the tied market where testimony suggested that, absent compulsion, plaintiff would not have purchased tied products at all). Accordingly, plaintiffs fail to state a *per se* tying claim.

Plaintiffs also fail to state a tying claim under the Rule of Reason. "The Rule of Reason requires, among other things, an adverse effect on competition in the relevant market." *Cancall II*, 2001 WL 293981, at *5 (citing *Vermont Mobile Home Owners' Ass'n, Inc. v. Lapierre*, No. 2:97–CV–209, 2001 WL 137583, at *3 (D.Vt. Feb. 1, 2001) and *Audell*, 903 F.Supp. at 371–72.) As set forth above, there are no anticompetitive effects on competition in the markets for any magazine titles or for any quantities of any magazine title, or in the market for distribution of such titles. The requirements of the Rule of Reason are therefore not satisfied. In sum, the Amended Complaint fails to state a claim for unlawful tying because its allegations demonstrate an absence of anticompetitive effects in the markets for the tied products. Accordingly, the Court dismisses plaintiffs' cause of action for alleged unlawful tying.

### C. Predatory Pricing (Count XIII)

Plaintiffs allege that the Distributors and Levy violated sections 1 and 2 of the Sherman Act, and the Valentine Act, by engaging in a conspiracy in which Levy charged certain retailers predatory (*i.e.* below cost) prices in order to drive plaintiffs out of business. (Am.Compl.¶¶ 282–306.) The defendants argue, on multiple grounds, that plaintiffs have failed to state a claim. (Distributors' Mem. at 18–20.) The Court finds that this cause of action must be dismissed because plaintiffs' have failed to state a claim under section 1 or section 2 of the Sherman Act. The first problem is, again, market definition. Although Count XIII refers primarily to sales of magazines to, and by, "Major Retailers" (Am.Compl.¶¶ 283, 285, 287, 291–94, 300–01), plaintiffs argue in their memoranda that four markets are at issue. (Pl.'s Mem. in Opp. to Def. Chas. Levy Circulating Co.'s Mot. to Dismiss Pls.' Am.

Compl. Pursuant to Rule 12(b)(6) ("Pls.' Levy Mem.") at 21; Pls.' Distributor Mem. at 29.) Two of these markets, "each of the Magazine supertitles distributed by the respective [Distributors]" (Am. Compl.¶ 38.J(ii)) and "distribution of the Magazine supertitles" (Am. Compl.¶ 38.J(iii)) are deficient for the reasons set forth in Section IV.B, *supra.* A third alleged market, "Magazine distribution through the checkout counters of Major Retailers" (Am.Compl.¶ 38.J(iv)) is also deficient. While a particular method of distributing a product may constitute a distinct market, a plaintiff seeking to establish such a market must allege that "enough customers do not view other methods of distribution as viable substitutes to the distribution method in question." *Pepsico, Inc. v. Coca–Cola Co.,* No.98 Civ. 3282(LAP), 1998 WL 547088, at *8 (S.D.N.Y. Aug. 27, 1998). To establish a market consisting solely of retail sales of Magazines through checkout counters of large retailers, plaintiffs would have to allege that a sufficient number of retail customers view other retail sales, such as retail sales at small retailers or newsstands, as inadequate substitutes. Plaintiffs make no such allegations. The only product or service markets that appear to be adequately alleged, then, are the distribution market and the wholesale market for publications. (Am.Compl.¶ 38.J(i).) As to the geographic component of the markets, plaintiffs allege that the relevant area consists of those territories in which plaintiffs, Levy, and non-party wholesaler Hudson News, conducted wholesale sales. (Am.Compl.¶ 38.J.) Hudson News' territory appears irrelevant because Hudson News' conduct is not at issue here. As to the territories in which plaintiffs did business, as noted previously, plaintiffs must distinguish among themselves as to their different territories. Assuming that plaintiffs have alleged markets consisting of magazine and book sales by distributors to wholesalers, or by wholesalers to retailers, in the geographic areas where each plaintiff and Levy did business, plaintiffs have failed to allege all of the elements required to assert a claim under section 1 or section 2 of the Sherman Act.

### 1. Section 1

Section 1 prohibits, among other things, conspiracies in restraint of trade. 15 U.S.C. § 1. A conspiracy to engage in predatory pricing would be barred under section 1. As this Court has previously ruled, however, where the facts alleged in a complaint demonstrate that an alleged predatory pricing conspiracy makes no economic sense, the cause of action must be dismissed. *Cancall I,* 2000 WL 272309, at *7 n. 4 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). *Cancall I* is similar to the instant action in this respect. In *Cancall I,* defendants Ericsson, Siemens, and Nortel manufactured handsets for use on defendant Omnipoint's wireless telephone network. Those handsets were sold exclusively to Omnipoint, which resold them to consumers and to other businesses, such as plaintiff Cancall, that also resold the handsets to consumers. *Id.* at *1. Since defendants were the exclusive source of handsets, and Cancall could only obtain handsets through the defendants, "predatory pricing to eliminate [Cancall] from that market [was] entirely unnecessary in order to charge supracompetitive prices." *Id.* at *7 n. 4. Accordingly, the Court dismissed the predatory pricing claim. *Id.* The same is true here with respect to the Distributors. Plaintiffs are not competing distributors. Rather, as plaintiffs allege, the Distributors are plaintiffs' exclusive source of supertitles and other magazines and books. It is entirely unnecessary for the Distribu-

tors to engage in predatory pricing in order to charge Plaintiffs supracompetitive prices or put plaintiffs out of business.

In opposition to this line of reasoning, plaintiffs offer two arguments. First, they contend that driving plaintiffs out of business through predatory pricing saves the Distributors the costs of either properly terminating plaintiffs or arranging a buyout of plaintiffs by another wholesaler. First, as set forth in Section V.A., *infra*, there are no enforceable contracts between plaintiffs and the Distributors; accordingly, the Distributors could terminate plaintiffs at will, with no costs. Second, even if the Distributors were required to give plaintiffs notice of termination, doing so would impose no costs on the Distributors. The only costs alleged are the costs of performing the contracts for an additional time. However, plaintiffs specifically allege that they bear all of the costs of distribution. (Am.Compl.¶¶ 46–55.) Thus, an additional period of performance would impose no costs on the Distributors. Third, plaintiffs do not allege any contractual requirement that the Distributors arrange a buyout of a terminated wholesaler. They allege only an industry custom. (Am.Compl.¶¶ 61–61A.) The Distributors could simply ignore such a custom. Thus, predatory pricing remains completely unnecessary.

Plaintiffs second argument is that the Distributors conspired to engage in predatory pricing to effectuate a scheme whereby Murdoch would become the sole wholesaler in the nation. This argument suffers from the same defect as the preceding one. Even if the Distributors wished to engage in the alleged scheme to make Murdoch the nation's only wholesaler, predatory pricing would be completely unnecessary. As set forth in the preceding paragraph, the Distributors could simply terminate plaintiffs and all of the other wholesalers, and then establish Murdoch as the sole wholesaler. Since, under any theory, plaintiffs alleged conspiracy to engage in predatory pricing is entirely unnecessary and makes no economic sense, plaintiffs fail to state a claim under section 1. Accordingly, the Court dismisses this cause of action.

### 2. Section 2

■ Plaintiffs' section 2 cause of action fares no better. Section 2 prohibits monopolization or attempted monopolization. 15 U.S.C. § 2. A section 2 plaintiff must allege that the defendant has, or has a dangerous probability of obtaining, a monopoly in the relevant market. *See Irvin Indus., Inc. v. Goodyear Aerospace Corp.*, 974 F.2d 241, 244 (2d Cir.1992) (monopolization claim requires, among other things, "monopoly power in the relevant market"); *Kelco Disposal, Inc. v. Browning–Ferris Indus.*, 845, F.2d 404, 407 (2d Cir.1988) (attempted monopolization claim requires, among other things, dangerous probability of obtaining monopoly power). As for actual monopoly power, plaintiffs admit that Levy does not currently have monopoly power. (Tr. at 32.) As for the possibility of acquiring monopoly power, plaintiffs alleged that, beginning in 1995, the exclusive territorial system was replaced with a system whereby wholesalers bid for the right to supply magazines and books to large retailers. (Am.Compl.¶¶ 62–64.) Plaintiffs also alleged that Levy obtained contracts with one or more large retailers for certain periods of time. (Am. Compl.¶ 291.) This does not establish that Levy will obtain a monopoly, only that it was the winning bidder for certain customers for certain times. In fact, the allegations regarding the establishment of a bidding system suggest that Levy is unlikely to have a monopoly, as it will have to compete against other wholesalers. The Court also notes that plaintiffs never al-

lege Levy's market share in any relevant geographic market. There is no basis for finding a dangerous probability of monopolization by Levy.

██ Plaintiffs argue in the alternative that the Distributors together have a monopoly in the distribution of magazines. Sales by distributors to wholesalers, however, constitute a separate market from sales by wholesalers to retailers. Thus, the Distributors' monopoly power upstream, in the distribution market, has no legal significance with respect to the wholesale market. *See H.L. Hayden Co. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005 (2d Cir.1989) (industry concentration at supplier level of distribution chain irrelevant to claim of attempted monopolization at dealer level). Moreover, the Court has already dismissed plaintiffs' conspiracy claim. Even if the Court had not dismissed the conspiracy claim, the alleged result of the conspiracy would be the destruction of Levy. (Am.Compl.¶¶ 300–03.) If Levy were soon to be destroyed by the Distributors, there would be no risk that Levy will obtain a monopoly in the wholesale market. Plaintiffs' own allegations demonstrate the absence of a required element of their section 2 cause of action. Accordingly, this cause of action is dismissed.

## V. PLAINTIFFS' NON–ANTITRUST CLAIMS

In addition to the antitrust claims described above, plaintiffs assert a variety of claims under state law, both statutory and common law. In this section, the Court addresses these non-antitrust claims.

### A. Breach of Contract by the Distributors (Count II)

Plaintiffs allege that by allowing Levy and other wholesalers to sell magazines and books to retailers in plaintiffs' various territories, the Distributors breached their contracts with plaintiffs. (Am. Compl.¶¶ 96–121.) The Distributors argue that this claim must be dismissed because the Statute of Frauds bars enforcement of the alleged contracts between the Distributors and plaintiffs. (Distributors' Mem. at 9–11.) The Court finds that the Statute of Frauds bars enforcement of the alleged contracts.

Both sides address this count under New York law, without reference to any applicable choice of law issues. Accordingly, the Court assumes that New York law applies to any contracts between the Distributors and plaintiffs. Under New York law, the Statute of Frauds generally requires that a contract be evidenced by a writing signed by the party against whom enforcement is sought. N.Y. Gen. Oblig. Law § 5–701(a); N.Y. U.C.C. § 2–201(1). The Amended Complaint does not allege a writing evidencing the contracts that have allegedly been signed by any of the Distributors. Accordingly, unless the contracts fall within one of the exceptions to the Statute of Frauds, this cause of action must be dismissed.

██ Plaintiffs first argue that their contracts are exempt from the General Obligation Law's Statute of Frauds because the contracts were capable of completion within one year. (Pls.' Distributor Mem. at 10.) It is clear, however, that a contract of indefinite term is capable of performance within a year only if there is an express provision for termination prior to the end of a year. "The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute." *Burke v. Bevona,* 866 F.2d 532, 538 (2d Cir.1989); *see also D & N Boening, Inc. v. Kirsch Beverages, Inc.,* 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992, 995 (1984) ("As this court early explained, 'termi-

nation is not performance, but rather the destruction of the contract where there is no provision authorizing either of the parties to terminate as a matter of right.'") Plaintiffs do not allege that their contracts with the Distributors contained express termination provisions, but only implied termination provisions. (Am.Compl.¶ 100.) Since no express term was ever alleged, the contracts are for an indefinite duration and so not capable of performance within one year. *See D & N Boening,* 483 N.Y.S.2d 164, 472 N.E.2d at 995. The alleged contracts are thus barred by § 5–701.

██ Additionally, even if the contracts had express termination provisions, they were not capable of being performed within one year. Plaintiffs allege that the distribution cycles for magazines lasted 4–6 months for weekly magazines and 6 months for monthly magazines. (Am. Compl.¶ 100.I, 100.J.) A contract could not be terminated with respect to a distribution cycle that had already begun. (*Id.* ¶ 100.K.) Plaintiffs further assert that both sides had to perform certain activities for 6 to 8 months after termination. (Pls.' Distributor Mem. at 10; Pls.' Levy Mem. at 7.) Thus, to terminate a contract for distribution of a monthly magazine, a Distributor would have to give notice of termination more than six months in advance (so as not to terminate a distribution cycle in progress) and then perform for at least six months after the cycle terminated. The contracts could not, then, be performed within one year. Accordingly, § 5–701 bars enforcement of the contracts.

██ U.C.C. § 2–201, the U.C.C. Statute of Frauds, also bars enforcement of the contracts if it applies. Plaintiffs contend that § 2–201 does not apply to distribution contracts (Pls. Distributor Mem. at 10–11.) New York courts are split on this issue. *Compare Huntington Dental &*

*Medical Co. v. Minnesota Mining and Mfg. Co.,* No. 95 Civ. 10959(JFK), 1998 WL 60954, at *4 (S.D.N.Y. Feb. 13, 1998) (2–201 applies) *and Wallach Marine Corp. v. Donzi Marine Corp.,* 675 F.Supp. 838, 840 (S.D.N.Y.1987) (same) *andUnited Beer Distrib. Co. v. Hiram Walker (N.Y.) Inc.,* 163 A.D.2d 79, 557 N.Y.S.2d 336, 337–38 (1990) (same) *with Paper Corp. v. Schoeller Tech. Papers,* 773 F.Supp. 632, 636–37 (S.D.N.Y.1991) (2–201 does not apply) *and Zimmer–Masiello, Inc. v. Zimmer, Inc.,* 159 A.D.2d 363, 552 N.Y.S.2d 935 (1990) (applying Gen. Oblig. Law. § 5–701 without consideration of § 2–201).

Plaintiffs argue that, if § 2–201 applies, their contracts with the Distributors fall under the "merchant's exception" to § 2–201. (Pls.' Distributor Mem. at 11–14.) The merchant's exception provides that, "[b]etween merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received." N.Y. U.C.C. § 2–201(2). Plaintiffs assert that a confirmatory writing under § 2–201(2) is "sufficient for the *entire oral agreement* to be taken out of the 2–201 Statute of Frauds." (Pls.' Distributor Mem. at 12 (citing *Bazak Int'l Corp. v. Mast Indus.,* 73 N.Y.2d 113, 538 N.Y.S.2d 503, 535 N.E.2d 633, 633–34 (1989) (emphasis added).)) Plaintiffs contend that because they sent the Distributors certain affidavits attesting to proper disposal of returned publications, the merchant's exception is satisfied as to the distributorship contracts in their entirety. (Pls.' Distributor Mem. at 12–14.) *Bazak* does not, however, establish that an entire oral agreement for an exclusive territorial distributorship is outside the Statute of

Frauds if there is a writing confirming sale of particular goods. *Bazak* concerned a contract for the one-time sale of certain textiles. 538 N.Y.S.2d 503, 535 N.E.2d at 634. The *Bazak* Court never considered whether confirmatory writings as to a particular shipment of goods established a distributorship agreement of indefinite duration for an exclusive territory. A court that did consider that issue ruled that such writings do not establish a distributorship agreement, but only the sale of the goods in question. *United Beer,* 557 N.Y.S.2d at 337–338. The Court agrees, and finds that the alleged affidavits referring to particular shipments of magazines are insufficient to satisfy the merchant's exception.

 Plaintiffs also argue that their performance of the contracts takes the contracts out of the Statute of Frauds. (Pls.' Distributor Mem. at 15.) Plaintiffs apparently rely here upon N.Y. U.C.C. § 2–201(3)(c). The plain language of this provision makes clear, however, that it only removes a contract from the Statute of Frauds to the extent that goods have been either paid for or received and accepted. N.Y. U.C.C. § 2–201(3)(c); N.Y. U.C.C. § 2–201, cmt. 2. As such, § 2–201(3)(c) cannot be used to establish a distributorship agreement. Section 2–201 thus bars enforcement of the contracts if it applies. For the reasons set forth above, the Statute of Frauds bars enforcement of plaintiffs' alleged contracts with the Distributors. Accordingly, plaintiffs' cause of action against the Distributors for breach of contract is dismissed.

B. Breach of the Covenant of Good Faith and Fair Dealing by the Distributors (Count II)

 Plaintiffs allege that the Distributors breached the distribution contracts' implied covenants of good faith and fair dealing. (Am.Compl.¶¶ 122–135.) A cause of action for breach of this implied covenant, however, is dependent upon the existence of an enforceable contract. *Kreiss v. McCown DeLeeuw & Co.,* 37 F.Supp.2d 294, 301 (S.D.N.Y.1999) ("no implied duty of good faith and fair dealing may attach to an unenforceable contract"); *American–European Art Assocs., Inc. v. Trend Galleries, Inc.,* 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1996) (cause of action for breach of implied covenant of good faith and fair dealing "properly dismissed for lack of a valid and binding contract from which such a duty would arise"). For the reasons set forth in Section V.A., *supra,* plaintiffs have failed to allege a valid contract. Accordingly, this cause of action is dismissed.

C. Promissory Estoppel Against the Distributors (Count III)

 Plaintiffs allege, in the alternative to their breach of contract claim against the Distributors, that the Distributors were promissorily estopped from taking away plaintiffs' exclusive territories. (Am. Compl.¶¶ 136–149.) The Distributors argue that this claim must be dismissed because plaintiffs have not alleged unconscionable injury. (Distributors' Mem. at 12–13.) The Court finds that this cause of action is barred by the Statute of Frauds and a lack of unconscionable injury. The parties only address this cause of action under New York law; accordingly, the Court assumes that New York law applies. A claim for promissory estoppel may not be maintained under New York law where the alternative claim for breach of contract is barred by the Statute of Frauds, unless the circumstances make it unconscionable to deny the promise upon which the plaintiff relied. *Merex A.G. v. Fairchild Weston Sys., Inc.,* 29 F.3d 821, 826 (2d Cir. 1994); *Philo Smith & Co. v. USLIFE Corp.,* 554 F.2d 34, 36 (2d Cir.1977); *D &*

*N Boening, Inc. v. Kirsch Beverages, Inc.,* 99 A.D.2d 522, 471 N.Y.S.2d 299, 302 (1984), *aff'd* 63 N.Y.2d 449, 483 N.Y.S.2d 164, 472 N.E.2d 992 (1984); *Swerdloff v. Mobil Oil Corp.,* 74 A.D.2d 258, 427 N.Y.S.2d 266, 269–70 (1980). Unconscionable injury for these purposes is "injury beyond that which flows naturally ... from the non-performance of the unenforceable agreement." *Merex,* 29 F.3d at 826.

■ Plaintiffs argue that they suffered unconscionable injury because the Distributors' failure to give them proper notice left plaintiffs with incurred costs, for matters such as vehicles, employment contracts, and real estate contracts, expenses that they could not reduce to match their reduced income (as they would have if given proper notice). (Pls.' Distributor Mem. at 16–17.) The facts alleged here are substantially similar to those in *Boening.* In that case, the plaintiff had, in 1955, entered into an oral agreement to become the prime distributor of a defendant's beverage for as long the plaintiff satisfactorily performed. In 1982, new management at the defendant terminated the plaintiff's distributorship. 471 N.Y.S.2d at 300. After dismissing plaintiff's breach of contract claim under the Statute of Frauds, the court addressed the promissory estoppel claim. The court found no unconscionable injury even though plaintiff alleged that, in reliance upon defendant's promise, it had invested considerable amounts of money in plant and capital equipment, increased its payroll, structured its growth around defendant's beverage, and forgone other business opportunities. *Id.* at 302. The court stated:

> [i]n sum, this is not a case where a promisee was induced to act upon an unfulfilled promise. It is clear that both sides to the agreement herein continued

to perform and derive benefits for almost three decades before the agreement was terminated. In our view, such circumstances are not so egregious as to render unconscionable the assertion of the Statute of Frauds.

*Id.; see also North Am. Knitting Mills, Inc. v. International Women's Apparel, Inc.,* No. 99 Civ. 4643(LAP), 2000 WL 1290608, at *3 (S.D.N.Y. Sept. 12, 2000); *Paper Corp. v. Schoeller Tech. Papers, Inc.,* 724 F.Supp. 110, 118–19 (S.D.N.Y. 1989). So too here. Plaintiffs and the Distributors operated for decades under oral agreements for plaintiffs to act as exclusive wholesalers for particular publications in particular areas. Both plaintiffs and the Distributors profited under this arrangement for many years. The fact that the Distributors eventually stopped performing under the oral agreements, to plaintiffs' financial detriment, is not unconscionable. Indeed, the loss of money invested in the business over the years is precisely the injury that flows naturally from the non-performance of an oral agreement to grant an exclusive wholesale territory until notice of termination is given. Because plaintiffs have failed to show unconscionable injury, their cause of action for promissory estoppel is dismissed.

D. Violation of the New York Franchise Sales Act by the Distributors (Count IV)

■ Plaintiffs allege that the Distributors are franchisors and that plaintiffs are franchisees, but that the Distributors did not comply with the requirements of the New York Franchise Sales Act, N.Y. Gen. Bus. Law § 680 *et seq.* (Am. Compl.¶¶ 150–177.) The Distributors argue that their relationships with plaintiffs did not fall within the scope of the Franchise Sales Act (Distributors' Mem. at 13–16), and that, in any event, any claim by the plaintiffs under the Franchise Sales

Act is time-barred. (*Id.* at 17–18.) The Court finds that, even assuming the Franchise Sales Act applies to the relationship between the Distributors and plaintiffs, any claim thereunder is barred by the statute of limitations.

The Franchise Sales Act has a three year statute of limitations. N.Y. Gen. Bus. Law § 691(4). Courts applying this provision have ruled that the limitations period begins to run when the the franchise contract is entered into, and that continuous violations do not toll the statute of limitations. *6100 Cleveland, Inc. v. Staff Builders Int'l, Inc.*, 127 F.Supp.2d 877, 884–85 (N.D.Ohio 1999); *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F.Supp. 276, 287 (S.D.N.Y.1991); *Leung v. Lotus Ride, Inc.*, 198 A.D.2d 155, 604 N.Y.S.2d 65, 67 (1993); *Fantastic Enter., Inc. v. S.M.R. Enter., Inc.*, 143 Misc.2d 124, 540 N.Y.S.2d 131, 134 (1988). *But cf. Keeney v. Kemper Nat'l Ins. Cos.*, 960 F.Supp. 617, 625 (E.D.N.Y.1997) (declining to follow *Zaro* or otherwise decide when statute of limitations began to run; cause of action dismissed on other grounds). Plaintiffs' agreement with each Distributor was entered into in 1981. (Am.Compl.¶ 152). Plaintiffs' original complaint was not filed until 2000. Accordingly, this claim is untimely. Plaintiffs argue that changes to their alleged franchise agreements created entirely new agreements or restarted the limitations period in some other fashion. (Pls.' Distributor Mem. at 20–21.) Plaintiffs do not, however, cite any authority in support of this argument. The Court concludes, consistent with the majority of the cases cited above, that the statute of limitations begins to run at the time that the parties first enter into the franchise agreement. Accordingly, the Court dismisses plaintiffs' cause of action for breach of the New York Franchise Sales Act as untimely.

**E. Inducing Breach of Contract or Interference with Advantageous Business Relationship By Levy (Count V)**

█ Plaintiffs allege that Levy tortiously interfered with their contracts or business relationships with the Distributors by causing the Distributors to violate plaintiffs' exclusive territories and permit Levy to sell to retailers in plaintiffs' territories. (Am.Compl.¶¶ 178–184.) Levy argues that its activities constituted permissible competition. (Levy's Mem. at 9–12.) The Court finds that Levy's alleged actions were not tortious under New York or Ohio law. The parties address this issue under New York and Ohio law. Because the result is the same under either, the Court will discuss both. First, plaintiffs' cause of action for inducing breach of contract must be dismissed because the Court has already found that the Statute of Frauds precludes enforcement of the contracts between plaintiffs and the Distributors. *See Herman & Beinin v. Greenhaus*, 258 A.D.2d 260, 685 N.Y.S.2d 41, 41 (1999) (New York law); *Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 619 N.Y.S.2d 260, 265 (1994) (same); *Bell v. Horton*, 113 Ohio App.3d 363, 680 N.E.2d 1272, 1274 (1996) (Ohio law).

█ Plaintiffs' cause of action for tortious interference with advantageous business relationships must also be dismissed. To state a claim for tortious interference with advantageous business relationships under New York law, a plaintiff must allege that the defendant interfered with an existing business relationship between the plaintiff and a third party, either for the sole purpose of harming the plaintiff or by wrongful means. *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205–206 (2d Cir. 1998); *PPX Enters. v. Audiofidelity En-*

*ters.,* 818 F.2d 266, 269 (2d Cir.1987); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 641 N.Y.S.2d 581, 664 N.E.2d 492, 496–97 (1996). Wrongful means include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference" with a business relationship. *Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445, 449 (1980).

■ Plaintiffs allege that Levy interfered with their existing relationships with the Distributors, thereby harming plaintiffs. (Am.compl.¶ 181.) Plaintiffs do not, however, allege that Levy intended *solely* to harm them. Indeed, the Amended Complaint refers to Levy as a competitor or potential competitor. (Am.Compl.¶¶ 69, 76.) Accordingly, plaintiffs must show wrongful means. Plaintiffs make three arguments as to wrongful means. (Pls.' Levy Mem. at 8–9.) First, they claim that Levy and the Distributors engaged in illegal anticompetitive conduct. This argument fails because the Court has dismissed plaintiffs' antitrust claims. Second, plaintiffs claim that Levy breached the Purchase Agreement by negotiating with the Distributors outside of plaintiffs' presence. Plaintiffs cite to no authority, however, in support of their claim that a breach of contract constitutes "unlawful means" as defined in *Guard–Life.* Even if an allegation of breach of contract were sufficient, the contract in question squarely contradicts plaintiffs' allegations.[6] The only section of the Purchase Agreement that restricted Levy's ability to negotiate with the Distributors outside of the plaintiffs' pres-

ence concerned negotiations for "Supplier Concessions." (Aff. of Richard L. Fenton in Supp. of Def. Chas. Levy Circulating Co.'s Mem. of Law in Supp. of its Mot. to Dismiss Pursuant to Rule 12(b)(6) ("Fenton Aff.") Ex. B at § 7.15.) The Purchase Agreement contained no restriction on Levy's ability to deal with the Distributors regarding any other matter. Plaintiffs' third argument is that Levy made fraudulent representations to plaintiffs in the course of negotiating the Purchase Agreement. However, these negotiations did not begin until late 1998. *See supra* p. 6. This is simply too late to be relevant here. The Distributors allegedly began to permit Levy to sell in at least some of the plaintiffs' territories beginning in 1995 or 1996. (Am.Compl.¶ 76.) Any interference had already occurred before any alleged misrepresentations were made in 1998. Accordingly, plaintiffs allege no wrongful means and so fail to state a claim for tortious interference with advantageous business relationships under New York law.

■ Under Ohio law, pleading tortious interference with business relationships requires five allegations: (i) a business relationship between plaintiff and a third party; (ii) knowledge of that relationship by the defendant; (iii) intentional and improper action by the defendant to terminate the business relationship; (iv) a lack of privilege; and (v) damages. *See Brookeside Ambulance, Inc. v. Walker Ambulance Svc.,* 112 Ohio App.3d 150, 678 N.E.2d 248, 252 (1996). Where the parties are competitors, determination as to whether the defendant's conduct was improper is governed by section 768 of the Second Restatement of Torts. *Brookeside,* 678 N.E.2d at 252. Section 768 pro-

---

**6.** Although this is a motion under Rule 12(b)(6), the Court may consider the Purchase Agreement because several of plaintiffs claims, including this one, are founded upon that contract. *See Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

vides that a defendant's actions are not improper if (i) the business relationship concerns a matter involved in the competition between plaintiff and defendant; (ii) the defendant does not employ wrongful means; (iii) the defendant's action does not create or continue an unlawful restraint of trade; and (iv) the defendant's purpose is at least partly to advance its interest in competing with the plaintiff. 678 N.E.2d at 252–53.

■ Levy argues that it meets the criteria of section 768. (Levy's Mem. at 9–12.) The relationships between plaintiffs and the Distributors clearly concern a matter in which plaintiffs and Levy allegedly competed, wholesale sales of publications. Levy is not alleged to have employed wrongful means as defined under Ohio law for the reasons set forth above with respect to New York law. *Cf. Willis Refrigeration, Air Conditioning & Heating, Inc., v. Maynard*, No. CA99-05-047, 2000 WL 36102, at *9 (Ohio Ct.App. Jan. 18, 2000) (defining wrongful means as including "violence, fraud, civil suits, and criminal prosecution."), *reconsideration granted in part*, 2000 WL 270048 (Ohio Ct.App. Mar. 13, 2000). Levy's action cannot now be said to create or continue an unlawful restraint of trade because the Court has dismissed plaintiffs' antitrust claims. Lastly, as set forth above, plaintiffs cannot dispute that Levy's actions were at least partly designed to advance Levy's competitive interest. Since Levy meets the criteria of section 768, its actions were not improper, and plaintiffs fail to state a claim under Ohio law. As a result of plaintiffs failure to state a claim under New York or Ohio law, the Court dismisses plaintiffs' cause of action for tortious interference with advantageous business relationships.

### F. Breach of the Implied Covenant of Good Faith and Fair Dealing by Levy (Count V)

■ Plaintiffs contend that Levy violated the Purchase Agreement's implied covenant of good faith and fair dealing by negotiating with the Distributors for Levy to sell magazines and books in plaintiffs' territories. Levy argues that this cause of action does not exist under applicable law. (Levy's Mem. at 12–13.) It is undisputed that Illinois law governs the contract between Levy and the plaintiffs. (Fenton Aff. Ex. B at § 13.10.) Under Illinois law, there exists no independent action for breach of the implied covenant of good faith and fair dealing. *Voyles v. Sandia Mortgage Corp.*, 196 Ill.2d 288, 256 Ill.Dec. 289, 751 N.E.2d 1126 (2001). Accordingly, the Court dismisses this cause of action.

### G. Unfair Competition by Levy (Count VI)

■ Plaintiffs allege that Levy engaged in unfair competition by obtaining plaintiffs' confidential business information and then using it to induce the Distributors to allow Levy to sell to retailers in plaintiffs' territories. (Am.Compl.¶¶ 192–199.) Levy argues that this claim is preempted by plaintiffs' trade secrets claim against Levy pursuant to Ohio Revised Code Ann. § 1333 .63. (Levy's Mem. at 13–14.) The Court finds that plaintiffs' claim under § 1333.63 preempts plaintiffs' cause of action for alleged unfair competition. The factual allegations underlying this cause of action are the same, or substantially the same, as those underlying plaintiffs' claim against Levy under § 1333.63. (*Compare* Am. Compl. ¶¶ 192–99 *with* Am. Compl. ¶¶ 223–33.) Ohio Revised Code Ann. § 1333.67 provides, in pertinent part:

(A) Except as provided in division (B) of this section, sections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

(B) These sections do not affect any of the following:

(1) Contractual remedies, whether or not based on misappropriation of a trade secret. . . .

The plain language of this statute provides that plaintiffs' tort claim for unfair competition, which is based upon misappropriation of plaintiffs' trade secrets, is preempted. Ohio Rev.Code Ann. § 1333.67; *see also Glasstech, Inc. v. TGL Tempering Sys., Inc.,* 50 F.Supp.2d 722, 730–32 (N.D.Ohio 1999). Plaintiffs appear to argue that § 1333.67(B)(1) allows a party to bring a tort claim for misappropriation against another party with which it has a contractual relationship. (Pls.' Distributor Mem. at 24; Pls.' Levy Mem. at 13.) This argument is contrary to the plain language of § 1333.67 and is unsupported by citation to any authority. Similarly unavailing is plaintiffs' citation to cases that predate the adoption of § 1333.67. (Pls.' Levy Mem. at 13.) Because plaintiffs' unfair competition claim against Levy sounds in tort, rather than contract, under § 1333.67 it is preempted by plaintiffs' § 1333.63 claim against Levy. Accordingly, this cause of action is dismissed.

H. Breach of Fiduciary Duty and Breach of the Duty to Hold in Confidence By All Defendants (Count VII)

Plaintiffs allege that the Distributors and Levy, by virtue of their respective contractual relationships with plaintiffs, had fiduciary duties to plaintiffs, as well as duties to hold in confidence plaintiffs' proprietary business information. These duties were breached, plaintiffs allege, when the defendants used plaintiffs' confidential information to solicit plaintiffs' customers and to enable Levy to sell to retailers in plaintiffs' territory. (Am. Compl.¶¶ 201–209.) The defendants argue that, under applicable law, they had no fiduciary obligations to plaintiffs and no duties to hold information in confidence. (Distributors' Mem. at 18–20; Levy's Mem. at 14–15.) The Court finds that defendants had no such duties to plaintiffs.

1. Alleged breach of fiduciary duty or duty of confidence by the Distributors

As against the Distributors, the legal prerequisites for the alleged duties are not met. The Distributors and plaintiffs address this question solely under New York law; accordingly the Court assumes that New York law applies. Under New York law, a distributorship agreement creates a confidential relationship, giving rise to fiduciary duties, only in rare circumstances. *Abernathy–Thomas Eng. Co. v. Pall Corp.,* 103 F.Supp.2d 582, 602 (E.D.N.Y.2000). Specifically, "a long-standing distributorship relationship in which the manufacturer dominated the distributor, and pursuant to which the distributor was contractually required to disclose proprietary information regarding its customers to the manufacturer, creates a duty on the part of the manufacturer not to use that information to the detriment of the distributor." *Id.* at 604 (construing, among others, *A.S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957) and *Zimmer–Masiello,* 159 A.D.2d 363, 552 N.Y.S.2d 935). Here, the Distributors stand in the position of *Pall'* s manufacturer and plaintiffs stand in the position of *Pall'* s distributor. Plaintiffs do not meet the *Pall* standard, however, because they do not allege that they were "contractually required" to pro-

vide confidential information to the Distributors. Plaintiffs allege only that the Distributors "had knowledge of plaintiffs' business" (Am.Compl.¶ 201) and that "plaintiffs' business information was constantly being provided" to the Distributors. (Am.Compl.¶ 203.) Plaintiffs' (apparently) voluntary sharing of information with the Distributors does not provide the rare circumstances giving rise to a fiduciary duty or other duty of confidence. Accordingly, this cause of action is dismissed as against the Distributors.

### 2. Alleged breach of fiduciary duty or duty of confidence by Levy

It is undisputed that the contract between Levy and the plaintiffs is governed by Illinois law. (Fenton Aff. Ex. B at § 13.10.) Plaintiffs offer no authority supporting their contention that a franchise or distribution contract may give rise to a fiduciary duty or duty of confidence under Illinois law. As Levy points out, the rule under Illinois law is to just the opposite effect. *See, e.g., Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.,* 970 F.2d 273, 280 (7th Cir.1992) (under Illinois law, "parties to a contract are not each other's fiduciaries ... even if the contract is a franchise"). The two specific contractual provisions upon which plaintiffs rely also fail to support its argument. First, plaintiffs argue that section 7.15 "created a fiduciary duty of Levy not to deal with any of the ... Distributors concerning plaintiffs...." (Pls.' Levy Mem. at 15.) As noted above, *see supra* p. 38, section 7.15 concerns only negotiations between Levy and the Distributors regarding "Supplier Concessions," not all negotiations between Levy and the Distributors, or even all negotiations between Levy and the Distributors concerning plaintiffs. Plaintiffs' contention that this limited restriction imposed a "fiduciary duty" is an unjustified

legal conclusion which the Court rejects as contrary to Illinois law. Second plaintiffs argue that section 7.4, entitled "Confidentiality; Public Announcements" created a duty of confidence for Levy. (Pls.' Levy Mem. at 16.) The plain language of section 7.4, however, demonstrates that the confidentiality obligations only extended to the Purchase Agreement itself. No confidentiality requirement is imposed concerning any information that either side learned about the other's business during the course of negotiations. Accordingly, plaintiffs have failed to establish that Levy had any fiduciary duty or duty of confidence under Illinois law. This cause of action is dismissed as against Levy.

### I. Violation of Ohio Revised Code Ann. § 1333.63 By Murdoch (Count VIII) and By Levy (Count IX)

Plaintiffs allege that Murdoch misappropriated plaintiffs' trade secrets, specifically plaintiffs' "Data System" for magazine distribution, in violation of Ohio Revised Code Ann. § 1333.63. (Am. Compl.¶¶ 210–22.) Murdoch argues that plaintiffs have failed to sufficiently allege willful and malicious conduct. (Distributors' Mem. at 20–21.) Plaintiffs allege that Levy misappropriated plaintiffs' trade secrets, including customer lists and financial information, in violation of § 1333.63. (Am. Compl.223–33.) Levy argues that plaintiffs' allegations do not satisfy the definitions of "trade secret" or "misappropriation" under Ohio law. (Levy's Mem. at 15–17.) The Court finds that plaintiffs have not adequately alleged trade secrets within the meaning of the Ohio Uniform Trade Secrets Act. A trade secret is defined as information that both "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can

obtain economic value from its disclosure or use" and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ohio Rev.Code Ann. § 1333.61(D). In Count VIII, plaintiffs allege that the information in question was "not known to third persons and constituted valuable trade secrets of the plaintiffs." (Am.Compl.¶ 213.) In Count IX, plaintiffs allege that the information in question was "proprietary to plaintiffs, not known to third persons, and constituted valuable trade secrets of the plaintiffs." (Am.Compl.¶ 226.) Even assuming these allegations satisfy the first prong of the trade secret definition, they plainly do not satisfy the second prong. There is no factual allegation as to any efforts that plaintiffs undertook to maintain the secrecy of the information in question. Absent such allegations, plaintiffs have not adequately pled the existence of a trade secret, without which there can be no misappropriation of a trade secret. Plaintiffs' conclusory allegation that the information was a trade secret is not enough. A plaintiff must do more to state a claim than simply allege a legal conclusion. Accordingly, plaintiffs' causes of action against Murdoch (Count VIII) and Levy (Count IX) under § 1333.63 are dismissed.

### J. Tortious Destruction of Business Against all Defendants (Count X)

■ Plaintiffs allege that Levy and the Distributors tortiously destroyed plaintiffs' business. (Am.Compl.¶¶ 234–43.) Defendants argue that this count states no cognizable claim under New York or Ohio law. (Distributors' Mem. at 21–22; Levy's Mem. at 17–18.) The Court finds that this cause of action must be dismissed for failure to state a claim under applicable law. As an initial matter, the Court agrees with the defendants that "tortious destruction of business" is not an independent cause of action under either New York or Ohio law.

The New York cases cited by plaintiffs do not establish a new and distinct tort of destruction of business. Rather, they deal with established torts such as fraud or tortious interference with contract. *See North Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 292 N.Y.S.2d 86, 239 N.E.2d 189 (1968) (fraud); *Rich v. New York Cent. & Hudson River R.R. Co.*, 87 N.Y. 382 (1882) ("actual and affirmative fraud"); *Albemarle Theatre, Inc. v. Bayberry Realty Corp.*, 27 A.D.2d 172, 277 N.Y.S.2d 505 (1967) ("inducing the alleged breach of contract"); *Schisgall v. Fairchild Publ'ns, Inc.*, 207 Misc. 224, 137 N.Y.S.2d 312 (1955) (*prima facie* tort). The Ohio cases cited by plaintiffs are of similar import, dealing with established torts or with contract claims. *See Garman v. Y.M.C.A.*, No. 1720, 1983 WL 2415 (Ct.App. May 3, 1983) (breach of lease agreement); I*nergystics v. Fairbairn*, No. 80–029, 1981 WL 5578 (Ct.App. May 15, 1981) (breach of confidentiality agreement and breach of fiduciary duty); *Bishop v. East Ohio Gas Co.*, No. 18969, 1943 WL 3194 (Ct.App. June 28, 1943) (destruction of personal property), *rev'd* 143 Ohio St. 541, 56 N.E.2d 164 (1944).

■ Even though "tortious destruction of business" is not a cognizable claim under applicable law, New York law may permit some recourse. In certain circumstances, New York courts recognize a claim for *prima facie* tort. *See, e.g., Mellencamp v. Riva Music Ltd.*, 698 F.Supp. 1154, 1158–59 (S.D.N.Y.1988) (construing *Schisgall); Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324, 1327 (1984). Ohio, however, does not recognize a cause of action for *prima facie* tort. *Costell v. Toledo Hospital*, 38 Ohio St.3d 221, 527 N.E.2d 858 (1988). Thus, there is a conflict of laws and the Court must determine which state's law applies. A federal court considering state law claims

under either diversity jurisdiction or supplemental jurisdiction applies the choice of law principles of the state in which the Court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (diversity jurisdiction); *North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 43 (2d Cir.1999) (supplemental jurisdiction). New York courts apply "interest analysis" to determine choice of law in tort cases. *Frink America, Inc. v. Champion Road Machinery*, 48 F.Supp.2d 198, 205 (N.D.N.Y.1999); *Dorsey v. Yantambwe*, 276 A.D.2d 108, 715 N.Y.S.2d 566, 569 (2000). Interest analysis calls for application of the law of the jurisdiction with the greatest contacts with the matter in dispute. *Frink*, 48 F.Supp.2d at 205; *Dorsey*, 715 N.Y.S.2d at 569. The most significant contacts are almost exclusively the domiciles of the parties and the locus of the tort. *Frink*, 48 F.Supp.2d at 205; *Dorsey*, 715 N.Y.S.2d at 569. Where the laws in conflict regulate conduct, the law of the jurisdiction where the tort occurred generally applies. *Frink*, 48 F.Supp.2d at 205. Where the defendants' conduct occurred in one place and the plaintiffs' injuries were suffered in another, the tort is considered to have occurred where the plaintiffs suffered injury. *Id.* Here, plaintiffs are domiciled in Ohio. The various defendants are domiciled in New York, New Jersey, or Illinois. Defendants' allegedly tortious conduct occurred in New York, New Jersey, Illinois, and possibly other states. Plaintiffs suffered any alleged injuries to their businesses in Ohio, where plaintiffs are domiciled and have their principal places of business. *See La Luna Enters., Inc. v. CBS Corp.*, 74 F.Supp.2d 384, 389 (S.D.N.Y.1999); *Frink*, 48 F.Supp.2d at 205. Thus, Ohio has the greatest interest and its law should apply. Under Ohio law, plaintiffs may not state a claim for *prima facie* tort. *Costell*, 38 Ohio St.3d 221, 527 N.E.2d 858. Accordingly, the Court dismisses the cause of action alleged in Count X.

### K. Breach of Confidential Relationship, Breach of Fiduciary Duty, and Common Law Misappropriation by Murdoch (Count XI)

■ Plaintiffs allege that Murdoch misappropriated plaintiffs' "Data System" and, in so doing, breached Murdoch's fiduciary duties and duties of confidence to plaintiffs. (Am.Compl.¶¶ 244–60.) Murdoch argues that this count is barred by plaintiffs' claim against it under Ohio Revised Code Ann. § 1333.63. (Distributors' Mem. at 22–23.) The Court finds that the causes of action in this count must be dismissed. For the reasons set forth in Section V.H., *supra*, Murdoch had neither fiduciary duties to, nor a relationship of confidence with, plaintiffs. For the reasons set forth in Section V.G., *supra*, plaintiffs' cause of action against Murdoch under Ohio Revised Code Ann. § 1333.63 precludes plaintiffs' common law claim against Murdoch for misappropriation of the same information. Accordingly, all of the causes of action in this count are dismissed.

### L. Violation of Ohio Revised Code Ann. § 4165.02(A)(12) by Levy (Count XIV)

■ Plaintiffs allege that Levy engaged in deceptive trade practices, in violation of Ohio Revised Code Ann. § 4165.02(A)(12), by making false statements regarding the circumstances under which Levy was charging lower prices than plaintiffs. (Am.Compl.¶¶ 307–313.) Levy argues that it made no "price reductions" within the meaning of § 4165.02(A)(12) and that plaintiffs have also not pled that anything Levy stated as to its prices was material. (Levy's Mem. at 20–22.) The Court finds that plaintiffs

have failed to plead the required element of materiality. Section 4165.02(A) provides, in pertinent part, that, "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person does any of the following ... (12) Makes false statements of fact concerning the reasons for, existence of, or amounts of price reductions."

Levy first argues that this statute only prohibits false statements about the reasons for sales, and that Levy did not reduce its own prices. (Levy's Mem. at 21.) This proposition is refuted by an Ohio decision cited by Levy. In *Diamond Co. v. Gentry Acquisition Corp.*, 48 Ohio Misc.2d 1, 531 N.E.2d 777, 782–83 (1988), the Court expressly considered a store's allegation that a competitor had violated the predecessor statute to § 4165.02(A)(12) by advertising false reasons for having lower prices than other stores. Although the court found that, on the facts presented, plaintiff did not show a likelihood of success on the merits, its consideration of the claim demonstrates that the predecessor statute covered not only statements about sales, but statements about relative prices among different businesses. Section 4165.02(A)(12) and its predecessor are identical in all material respects. *Compare* Ohio Rev.Code Ann. § 4165.02(A)(12) *with* former Ohio Rev.Code Ann. § 4165.02(J), *quoted in Diamond*, 531 N.E.2d at 779. Thus, Levy's first argument does not compel dismissal. Levy's second argument, that plaintiffs rely on implied statements, is also unavailing. (Levy's Mem. at 21.) As Levy concedes, plaintiffs also allege actual statements by Levy concerning its prices. (*Id.*) Thus, even if implied statements are insufficient, plaintiffs have alleged actual statements, allegations which are clearly sufficient. Levy's final argument, however, is meritorious. As Levy points out, Ohio courts require that a statement allegedly in violation of § 4165.02(A) be material. *Diamond*, 531 N.E.2d at 781–82. Plaintiffs nowhere allege that any statements by Levy as to Levy's lower prices were in any way material to any of Levy's customers. Plaintiffs have thus failed to allege a required element of their cause of action under § 4165.02(A)(12). Accordingly, the Court dismisses this cause of action (Count XIV).

M. Unjust Enrichment, Restitution, and Breach of Contract Implied in Law by All Defendants (Count XV)

Plaintiffs allege that the Distributors were unjustly enriched or breached a contract implied in law by allowing Levy to sell to certain retail customers in plaintiffs' territories. (Am.Compl.¶¶ 314–16, 318–21.) Plaintiffs also allege that those same sales by Levy constituted unjust enrichment or breach of a contract implied in law by Levy. (Am.Compl.¶¶ 314, 317, 318–21.) The Distributors argue that the cause of action against them is vague and conclusory. (Distributors' Mem. at 31–32.) Levy argues that plaintiffs have failed to allege that plaintiffs conferred any benefit on Levy. (Levy's Mem. at 22.) The Court finds that plaintiffs have failed to state a claim against the Distributors or Levy.

1. The Distributors

Plaintiffs' cause of action against the Distributors under Count XV is barred by the Statute of Frauds. The parties address this cause of action against the Distributors only under New York law; accordingly, the Court assumes that New York law applies. Under New York law, a cause of action for unjust enrichment or quasi-contract requires proof that (i) defendant was enriched (ii) at plaintiff's expense (iii) in circumstances where it would be unjust for defendant not to compensate

plaintiff. *Vox v. Makela,* No. 99 Civ. 10097(AGS), 2000 WL 1708181, at *4 (S.D.N.Y. Nov. 14, 2000). Plaintiffs claim that the Distributors were enriched at plaintiffs' expense because the Distributors required that plaintiffs purchase publications in exchange for exclusive territories, then took away the exclusive territories while plaintiffs were still purchasing the publications. (Am.Compl.¶¶ 315–16.) This claim constitutes a restatement of plaintiffs' breach of contract claim against the Distributors, which the Court dismissed on Statute of Frauds grounds. No cause of action for unjust enrichment may be asserted that is repetitive of a contract claim dismissed because of the Statute of Frauds. *See Strauss v. Fleet Mortgage Corp.,* 724 N.Y.S.2d 356, 2001 WL 470814 (N.Y.App.Div. Apr.30, 2001). Accordingly, plaintiffs' cause of action in Count XV against the Distributors is dismissed.

### 2. Levy

 As against Levy, plaintiffs have also failed to plead the necessary elements of their alleged cause of action. The parties address the cause of action against Levy under Ohio law; accordingly, the Court assumes that Ohio law applies. Under Ohio law, a claim of unjust enrichment requires a showing of (i) plaintiff's conferring of a benefit upon defendant; (ii) defendant's knowledge of the benefit; and (iii) defendant's retention of the benefit under circumstances where it would be unjust to do so without payment. *White v. Smith & Wesson,* 97 F.Supp.2d 816, 829 (N.D.Ohio 2000). Levy's replacing plaintiffs as the wholesaler for certain allegedly valuable customers in plaintiffs' territory does not under law amount to a benefit conferred upon Levy by plaintiffs. These allegations demonstrates only the fact of competition. Plaintiffs argue in their memorandum that confidential information obtained from plaintiffs by Levy, in breach

of the Purchase Agreement, constitutes a benefit. (Pls.' Levy Mem. at 25–26.) To the extent that this claim depends upon the existence of the Purchase Agreement, the fact that there was such a contract precludes a claim for unjust enrichment. *Patterson v. Village of Chesapeake,* No. 95CA19, 1996 WL 668831, at *2 (Ohio Ct. App. Nov. 15, 1996) ("Where there is an express contract between the parties, none can be implied.... That is to say that a theory of quasi contract or unjust enrichment is not available where there exists an express contract between the parties.") To the extent that this claim does not depend upon the contract, but is based on Levy's alleged appropriation of confidential information, the claim is precluded by plaintiffs' cause of action against Levy under Ohio Revised Code Ann. § 1333.63. *See supra* Section V.G. Accordingly, the claim under Count XV is dismissed as against Levy.

## VI. LEAVE TO REPLEAD

"It is the usual practice upon granting a motion dismiss to allow leave to replead.... Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Cortec,* 949 F.2d at 48. One justifying reason is futility of the amendment. *In re American Exp. Co. Shareholder Litigation,* 39 F.3d 395, 402 (2d Cir.1994). Counts II, III, IV, VI, X, XII, XIII, and XV are all dismissed with prejudice because any amended pleading of the causes of action therein would be futile. The same is true of Count V to the extent that it asserts causes of action for breach of the implied covenant of good faith and fair dealing or for inducing breach of contract, Count VII to the extent that it is asserted against Levy, and Count XI to the extent that it alleges common law misappropriation.

For the reasons set forth above, plaintiffs' causes of action enumerated above in this paragraph fail as a matter of law. The Court finds that plaintiffs are unable state a claim as to the causes of action asserted therein. Those motions to dismiss the causes of action not enumerated in this paragraph are granted with leave to plaintiffs to replead.

## VII. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss all of the counts in the Amended Complaint are granted. Murdoch's motion to dismiss the original Complaint is denied as moot as a result of plaintiffs having filed the Amended Complaint. In the event that plaintiffs propose to file a Second Amended Complaint, consistent with Section VI, *supra*, they shall file such complaint no later than June 21, 2001.

SO ORDERED.