**Salvatore MOCCIO, Rose Moccio, Robert Grossman, Norman Levinsohn and Howard Winston, As Individuals and as Class Representatives, Plaintiffs,**

v.

**CABLEVISION SYSTEMS CORPORATION, the Yankeesnets, Inc. d/b/a New York Yankees, Yankees Entertainment and Sports Network, LLC and MSG Network, Inc., Defendants.**

No. 02CV2138TCPEBT.

United States District Court, E.D. New York.

June 14, 2002.

---

Lenard Leeds, John F. Wirenius, Leeds, Morelli & Brown, P.C., Carle Place, NY, for Howard Winston, Norman Levinsohn, Robert Grossman, Rose Moccio, Salvatore Moccio.

Dolores Fredrich, Farrell Fritz, PC, Uniondale, NY, for Cablevision Systems Corp., MSG Network, Inc.

Kenneth L. Steinthal, Weil, Gotshal & Manges LLP, New York City, for Yankees Entertainment and Network, LLC.

Alan Vickery, Boies, Schiller & Flexner LLP, New York City, for Yankeenets, Inc., Yankees Entertainment and Sports Network, LLC.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Defendants Cablevision Systems Corporation ("Cablevision") and MSG Network, Incorporated ("MSGN") cross-move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Amended Class Action Complaint.

Cablevision and MSGN also move pursuant to Rule 11 of the Federal Rules of Civil Procedure to impose sanctions on Plaintiffs' attorneys.

For the reasons stated below: (1) Cablevision's and MSGN's Cross–Motion to Dismiss Plaintiffs' Amended Class Action Complaint is GRANTED; and (2) Cablevision's and MSGN's sanctions motion is DENIED.

## BACKGROUND

This is a class action lawsuit [1] wherein Plaintiffs allege that Defendants conspired to defraud Cablevision subscribers in the New York area by forcing them to purchase cable television services at artificially inflated prices. Plaintiffs have asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and

---

1. The Court has not yet certified a class.

the Sherman Antitrust Act. Plaintiffs have also interposed various State law claims.

## A. The Parties

The Plaintiffs are Cablevision subscribers who reside in Nassau and Rockland Counties in New York State. (Am. Compl.¶¶ 5–9.) Plaintiffs are all long-time fans of the New York Yankees baseball team, and all heretofore subscribed to premium Cablevision cable television services in order to receive televised broadcasts of New York Yankees baseball games. (Am. Compl.¶ 10.)

Defendant Cablevision is a New York Corporation with its principal place of business in Bethpage, New York. (Am. Compl. ¶ 11.) Cablevision provides cable television services to approximately three million subscribers in, among other places, Nassau and Rockland Counties. (Am. Compl.¶¶ 9–5, 59–60.)

Defendant MSGN is also a New York Corporation with its principal place of business in New York, New York. (Am. Compl.¶ 12.) MSGN is a Cablevision subsidiary and heretofore enjoyed the exclusive right to broadcast New York Yankees baseball games on cable television. (Am. Compl.¶¶ 12, 36.)

Former Defendant YankeesNets, Incorporated ("YankeesNets") owns the New York Yankees ("Yankees") baseball team. (Am.Compl.¶ 14.) YankeesNets, a New York Corporation, has its principal place of business in Bronx County, New York. (Am.Compl.¶ 14.)

Former Defendant Yankees Entertainment and Sports Network, L.L.C. ("YES") is a New York limited liability company with its principal place of business in New York, New York. (Am.Compl.¶ 13.) YES is owned primarily by the Yankees, who created YES in 2001. (Am.Compl.¶¶ 14, 35.) YES currently holds the exclusive right to broadcast 130 Yankees games on

cable television during this season. (Am. Compl.¶¶ 35–36, 43.)

## B. Plaintiffs' Allegations

### 1. The Contract Dispute Between Cablevision and YES

Before 1988, the Yankees sold the right to broadcast Yankees baseball games to various public television stations around the nation. (Am.Compl.¶¶ 17–18.) Accordingly, Yankees fans who lived in areas where public television stations had contracted with the Yankees could watch televised broadcasts of Yankees baseball games without paying for any special services. (Am.Compl.¶¶ 18–19.)

In 1988 however, the Yankees stopped contracting with local public television stations for the right to broadcast Yankees baseball games and began contracting with cable television providers to broadcast those games. (Am.Compl.¶ 20.) MSGN was one such cable television station with whom the Yankees contracted. (Am. Compl.¶ 20.) Plaintiffs allege that at some point, MSGN and Cablevision acquired a monopoly over the broadcast rights to Yankees baseball games in an undisclosed area. (Am.Compl.¶¶ 21, 23.)

After forming YES in 2001, the Yankees renegotiated its regional cable broadcast licences and licensed the exclusive right to broadcast Yankees baseball games on cable television to YES. (Am.Compl.¶¶ 35–36.) YES, however, is not currently available on the Cablevision cable television system. (Am.Compl.¶ 38.) Accordingly, approximately three million Cablevision subscribers cannot currently watch 130 cable broadcast Yankees baseball games on Cablevision during this season. (Am. Compl.¶¶ 38, 43.)

Cablevision does not currently offer YES as a channel on its cable television system because YES and Cablevision have

been unable to agree on which Cablevision service tier in which to include YES. (Am. Compl.¶¶ 38, 43.) Cablevision wishes to offer YES as a premium channel that Cablevision subscribers would have to pay extra fees (above those paid to receive basic cable television services) to receive. (Am.Compl.¶ 39.) Cablevision would purportedly allow YES to set the cost of those extra fees. (Am.Compl.¶ 39.)

YES allegedly wishes to have Cablevision offer it as part of Cablevision's basic service plan so that Cablevision subscribers could obtain YES by paying only for basic Cablevision service. (Am. Compl.¶ 40.) YES purportedly wishes to have Cablevision pay it $72,000,000.00 for the privilege of carrying YES as a basic channel, or approximately $24.00 per Cablevision subscriber. (Am.Compl.¶ 40.) Cablevision would supposedly have to charge all of its subscribers an additional $2.00 per month to accommodate YES' plan. (Am.Compl.¶ 41.)

Cablevision allegedly rejected YES' offer on grounds that not all Cablevision subscribers should have to pay to receive programming that only a few subscribers might wish to view. (Am.Compl.¶ 41.) YES supposedly rejected Cablevision's proposal on grounds that not all Cablevision subscribers would have access to Yankees baseball games if Cablevision offered YES as a premium channel. (Am. Compl.¶ 42.)

### 2. Plaintiffs' Claims Against Cablevision and MSGN Individually

Plaintiffs aver that Cablevision and MSGN have: (1) exploited their monopoly positions over Yankees baseball games;[2] (2) conspired to raise Cablevision subscription rates by abusing their monopoly positions; (3) tied receipt of MSGN programming to receipt of other premium Cablevision channels which certain Yankees fans and Cablevision subscribers do not wish to receive; and (4) conspired to exclude YES from Cablevision's cable television system. (Am.Compl.¶¶ 21, 23–27, 29–33.)

Plaintiffs aver that Cablevision has tied receipt of those premium channels to MSGN by making it economically irrational to purchase MSGN separately from the allegedly tied channels. (Am.Compl.¶¶ 23–24, 83.) Specifically, Plaintiffs contend that Cablevision charges subscribers $54.60 per month to receive basic cable television service with MSGN. (Am. Compl.¶ 25.) Cablevision allegedly charges subscribers only $49.55, however, to receive its Optimum Plan service, which includes not only MSGN, but also several other premium channels.[3] (Am. Compl.¶¶ 25–26.)

Plaintiffs further allege that Cablevision and MSGN have exploited their monopoly positions[4] to limit YES' market penetration in an undisclosed market. (Am. Compl.¶¶ 29, 33.) Finally, Plaintiffs contend (albeit nebulously) that Cablevision and MSGN have vertically conspired to exclude YES from Cablevision's basic cable television service and have treated it differently from other similarly situated cable television sports networks as part of a group boycott or concerted refusal to deal. (Am.¶¶ 29, 31–34.)

---

**2.** The Court finds this allegation somewhat perplexing in light of Plaintiffs' contention that YES, and not MSGN, possesses the exclusive right to broadcast Yankees baseball games, which was at one point the gravamen of this lawsuit.

**3.** Those channels include the Disney Channel, the New Encore, the Food Network, the Independent Film Network, MuchMusic, Romance Classics and Starz!. (Am.Compl.¶ 25.)

**4.** Plaintiffs failed to aver the markets over which Cablevision and MSGN allegedly have a monopoly.

### 3. Plaintiffs' Claims Against the Yankees and YES Individually

Plaintiffs have alleged that YES and the Yankees enjoy a monopoly over the broadcast rights to Yankees baseball games and that YES and the Yankees have also engaged in illegal tying practices. (Am. Compl.¶¶ 44–46, 84.) Specifically, Plaintiffs contend: (1) that YES and the Yankees show programing on YES that is unrelated to Yankees baseball games; (2) that many YES viewers wish to watch only Yankees baseball games; and (3) that those viewers are forced to purchase YES' non-game programming in order to see Yankees baseball games. (Am. Compl.¶¶ 45–47.) YES and the Yankees purportedly initiated that alleged tying arrangement to extort exorbitant subscription fees from cable television subscribers who wish to watch Yankees baseball games. (Am.Compl.¶ 46.)

Plaintiffs also allege that YES and the Yankees have intentionally fomented an artificial contract impasse with Cablevision and MSGN in order to obtain "greater market power over MSGN in other markets." (Am.Compl.¶ 50.) Plaintiffs further aver that YES and the Yankees have insisted on being placed in Cablevision's basic subscription tier in an effort to deliberately and impermissibly inflate YES' market share (in an undefined market), thereby disadvantaging MSGN. (Am. Compl.¶¶ 52–53.)

### 4. Plaintiffs' State Law Claims

Plaintiffs allege that Cablevision and MSGN materially misled Plaintiffs through their sales and marketing techniques and that those sales and marketing tactics violate New York General Business Law § 349. (Am.Comp.¶¶ 88–91.) Plaintiffs further aver that Cablevision breached its subscription contracts by failing to broadcast Yankees baseball games as it supposedly promised to do.[5] (Am.Compl.¶¶ 92–95.) Finally, Plaintiffs contend that YES and the Yankees tortiously interfered with their Cablevision subscription contracts. (Am.Compl.¶¶ 96–98.)

### 5. Conspiracy Claims Against Cablevision, MSGN, YES and the Yankees

Plaintiffs additionally allege that Cablevision and MSGN (collectively "Cablevision Enterprise") and YES and the Yankees (collectively "Yankees Enterprise") have conspired to exact excessive subscription fees from Cablevision subscribers who wish to receive broadcasts of Yankees baseball games. (Am.Compl.¶¶ 54, 85.) The Yankees Enterprise purportedly seeks to elicit those fees from all three million Cablevision subscribers. (Am.Compl.¶ 55.) The Cablevision Enterprise allegedly desires to wrest those sums from a subset of its subscribers that are willing to pay for Yankees baseball games carried by YES. (Am.Compl.¶ 56.)

The Cablevision and Yankee Enterprises have also supposedly conspired with each other to contrive a contractual stalemate that would deny Cablevision subscribers Yankees baseball game broadcasts and consequently frustrate those subscribers to the point that they would accept any deal struck by Cablevision and YES, even if that deal would significantly increase their Cablevision subscription fees. (Am. Compl.¶¶ 57, 77.) Both enterprises have furthered their supposed conspiracy by publicly stating that they were individually acting solely in the best interests of Yankees fans and Cablevision subscribers. (Am.Compl.¶ 66.) Both enterprises have

---

**5.** Specifically, Plaintiffs allege that they "entered into contractual relations that specified that Cablevision would provide programing that would include Yankee baseball games." (Am.Compl.¶ 93.)

also purportedly used the mails, radio and television to transmit false advertisements and untruthful statements in furtherance of their alleged conspiracy. (Am. Compl.¶¶ 79–81.)

## C. Procedural History

Plaintiffs commenced this action on April 9, 2002 by filing a Complaint. On April 10, 2002, United States District Court Judge Joanna Seybert ordered Defendants to show cause why Plaintiffs should not be granted a preliminary injunction: (1) requiring Defendants to broadcast regular season Yankees baseball games pending the conclusion of this lawsuit; or (2) requiring Defendants to broadcast regular season Yankees baseball games for sixty days and appointing a special master to resolve Cablevision's and YES' contract dispute.

On April 19, 2002, Cablevision, MSGN, YES and the Yankees all cross-moved to dismiss the Complaint. That same day, Plaintiffs filed an Amended Class Action Complaint.

On April 22, 2002, the parties appeared to argue Plaintiffs' Motion for a Preliminary Injunction and for the Appointment of a Special Master. The Court heard oral argument on that motion and reserved decision.

At that appearance, Cablevision and MSGN requested that their Cross–Motion to Dismiss the Complaint attach to the Amended Class Action Complaint and announced their intention to move for the imposition of Rule 11 sanctions on Plaintiffs' attorneys. Cablevision and MSGN also asked the Court to set a seven day safe-harbor period for filing their Rule 11 motion with the Court. The Court grant-

ed both of Cablevision's and MSGN's requests.

By letter dated April 25, 2002, Plaintiffs voluntarily withdrew their Motion for a Preliminary Injunction or for the Appointment of a Special Master. On April 26, 2002, Plaintiffs filed a proposed Stipulation of Dismissal dismissing their claims against YES and the Yankees. On May 29, 2002, the Court approved that Stipulation of Dismissal and YES and the Yankees were removed from the case.

Accordingly, only Cablevision and MSGN remain as defendants in this action.[6] The Court now considers their Cross–Motion to Dismiss the Amended Class Action Complaint and their Motion for Rule 11 Sanctions. The Court grants the former but denies the latter.

## DISCUSSION

### A. Standard on Motions to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits both partial and complete dismissal for " 'failure to state a claim upon which relief can be granted.' " *Sweet v. Sheahan*, 235 F.3d 80, 84 (2d Cir.2000) (quoting FED.R.CIV.P. 12(b)(6)). On Rule 12(b)(6) motions to dismiss, Courts may not consider matters outside the pleadings, *see Wall v. Roman*, 18 Fed. Appx. 41, 42–43, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4 (2d Cir. Sept. 6, 2001); *Leonard F. v. Israel Disc. Bank*, 199 F.3d 99, 107 (2d Cir.1999), but may consider documents attached to pleadings, documents referenced in pleadings or documents that are integral to the pleadings. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir.2002). Courts

---

6. Inexplicably, Plaintiffs have not, by motion or otherwise, amended the Amended Class Action Complaint to eliminate their claims against YES or the Yankees. The Court has accordingly been forced, as best it could, to unilaterally rewrite many of those claims consistent with the Court's obligation to construe all facts and inferences in Plaintiffs' favor. *See* DISCUSSION Sec. A., *infra*.

must also " 'take all factual allegations as true and [must] construe all reasonable inferences in the plaintiff's favor.' " *Wall,* 18 Fed.Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4 (quoting *Lee v. Bankers Trust,* 166 F.3d 540, 543 (2d Cir.1999) (internal citations omitted)); *Sweet,* 235 F.3d at 84.

On Rule 12(b)(6) motions to dismiss, courts assess only the legal feasability of the complaint and whether plaintiffs have pled claims on which they are entitled to discovery. *See Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). Courts do not consider whether plaintiffs are ultimately likely to prevail at trial on those claims. *Sims,* 230 F.3d at 20; *Chance,* 143 F.3d at 701. Accordingly, dismissal is only appropriate if the plaintiff " 'can prove no set of facts in support of his claim which would entitle him to relief.' " *Tarshis v. Riese Org.,* 211 F.3d 30, 35 (2d Cir.2000) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Lee,* 166 F.3d at 543.

## B. Plaintiffs' RICO Claims

Plaintiffs have alleged that Cablevision and MSGN violated RICO. However, Plaintiffs did not plead their RICO claim adequately. Plaintiffs' RICO claim is accordingly dismissed.

■ Congress enacted RICO to prevent organized crime from infiltrating America's legitimate business organizations. *See Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir.2001); *Procter & Gamble Co. v. Big Apple Indus. Bldgs.,* 879 F.2d 10, 14 (2d Cir.1987); *see also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,* 755 F.2d 239, 250 (2d Cir.1985). RICO permits civil litigants whose businesses or property were injured by a RICO violation to sue for treble damages. 18 U.S.C. § 1964(c) (1994); *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.,* 271 F.3d 374, 380 (2d Cir.2001); *Attorney Gen. of Canada,* 268 F.3d at 107.

■ To state prima facie RICO claims, plaintiffs must plead: (1) that defendants violated 18 U.S.C. § 1962; (2) that defendants injured plaintiffs' business or property; and (3) that plaintiffs' injury was caused by defendants' § 1962 violation. *Attorney Gen. of Canada,* 268 F.3d at 107; *Commercial Cleaning Servs., L.L.C.,* 271 F.3d at 380; *De Falco v. Bernas,* 244 F.3d 286, 305 (2d Cir.2001).

■ Section 1962 of the United States Code prohibits "any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c);[7] *Cofacredit, S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir.1999). To state § 1962(c) violations, plaintiffs must plead that they were injured: " '(1) [by] conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *De Falco,* 244 F.3d at 306 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)); *Cofacredit, S.A.,* 187 F.3d at 242; *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994). Plaintiffs must allege that each defendant individually violated § 1962(c). *See De Falco,* 244 F.3d at 306.

---

**7.** Plaintiffs did not state which RICO section Cablevision and MSGN are alleged to have violated. A thorough reading of the Amended Class Action Complaint suggests, however, that § 1962(c) is the most likely candidate. Accordingly, the Court presumes that Plaintiffs have attempted to plead a § 1962(c) violation.

Persons are individuals or entities capable of holding beneficial property interests. 18 U.S.C. § 1961(3). Conduct is an undefined term.

■ Enterprises include corporations and other legal entities. 18 U.S.C. § 1961(4); *De Falco*, 244 F.3d at 306. Enterprises must be legally or actually distinct from the persons conducting the enterprise's racketeering activities. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–63, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); *De Falco*, 244 F.3d at 307; *Anatian v. Coutts Bank (Switz.) Ltd.*, 193 F.3d 85, 88–89 (2d Cir.1999).

A pattern of racketeering activity requires at least two racketeering acts within a ten year period. 18 U.S.C. § 1961(5); *De Falco*, 244 F.3d at 306. Racketeering acts include mail and wire fraud. 18 U.S.C. § 1961(b); *see* 18 U.S.C. §§ 1341, 1343.

■ Plaintiffs who allege mail and wire fraud as the predicate racketeering acts must comply with the pleading requirements imposed by Rule 9 of the Federal Rules of Civil Procedure. *See Anatian*, 193 F.3d at 88; *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir.1999); *S.Q.K.F.C., Inc., v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633–34 (2d Cir. 1996). Rule 9 of the Federal Rules of Civil Procedure requires plaintiffs to plead fraud with particularity. FED.R.CIV.P. 9(b).

Particularity requires plaintiffs to plead the time, place, speaker and content of the fraudulent statement. *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir.2001); *Narumanchi v. FEMA*, No. 99–6139, 1999 WL 1070090, *1, 1999 U.S.App. LEXIS 30444, at *3 (2d Cir. Nov. 18, 1999); *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir.1987). Particularity may also require plaintiffs to plead facts evidencing fraudulent intent or knowledge of falsity. *Caputo*, 267 F.3d at 191; *Narumanchi*, 1999 WL 1070090, *1, 1999 U.S.App. LEXIS 30444, at *3.

### 1. Plaintiffs Failed to Plead a Prima Facie RICO Claim

Even if the facts and inferences are construed in their favor, *see Wall*, 18 Fed. Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, Plaintiffs failed to state a prima facie RICO claim against Cablevision and MSGN. Dismissal of Plaintiffs' RICO claim is therefore appropriate.

■ Plaintiffs have pled, albeit with minimal particularity,[8] that Cablevision and MSGN violated § 1962 by committing mail and wire fraud. (Am.Compl. ¶¶ 55,[9] 59–61, 64, 66, 79.) Generously viewed, Plaintiffs have also pled that they were injured by Cablevision's and MSGN's purported mail and wire fraud. (Am. Compl.¶ 75.) Those two allegations satisfy Plaintiffs' prima facie burden of pleading:

---

**8.** The only purportedly fraudulent statements alleged with particularity were made by Leo J. Hindery, Jr., who is YES' "chairman." (Am.Compl.¶ 66.) YES is no longer a defendant in this action. Accordingly, the Court seriously doubts whether Plaintiffs have averred Cablevision's and MSGN's supposed fraud with the requisite particularity. However, the Court does not rely on that defect to dismiss Plaintiffs' RICO claim.

**9.** Plaintiffs failed to number the paragraphs in their Amended Class Action Complaint properly. Pages one through thirteen of the Amended Class Action Complaint contain paragraphs one though sixty-six. The first paragraph on page fourteen of the Amended Class Action Complaint is numbered fifty-five. The paragraphs in the Amended Class Action Complaint then run consecutively upwards from paragraph fifty-five on page fourteen of the Amended Class Action Complaint. This reference refers to the second paragraph fifty-five, contained on page fourteen of the Amended Class Action Complaint.

(1) a § 1962 violation; and (2) injury caused by that violation. *See Attorney Gen. of Canada*, 268 F.3d at 107; *Commercial Cleaning Servs., L.L.C.*, 271 F.3d at 380; *De Falco*, 244 F.3d at 305. However, Plaintiffs did not properly allege that they were injured in their business or property and have therefore failed to state a prima facie RICO claim. *See Attorney Gen. of Canada*, 268 F.3d at 107; *Commercial Cleaning Servs., L.L.C.*, 271 F.3d at 380; *De Falco*, 244 F.3d at 305.

Plaintiffs have not averred that their business was injured by Cablevision's or MSGN's purported RICO violations. Accordingly, Plaintiffs must allege that Cablevision's and MSGN's supposed RICO violations injured their property.

While Plaintiffs did allege that they were long-time baseball fans who subscribed to premium Cablevision services in order to receive broadcasts of Yankees baseball games (Am.Compl.¶¶ 10, 60, 75, 92–95), and while they did allege a contractual right to receive *some* Yankees baseball games from Cablevision this season, they did not plead any contractual right to receive broadcasts of *every* Yankees baseball game played this season. Plaintiffs concede that they will receive thirty-two broadcast Yankees baseball games from Cablevision this season. (Am.Compl.¶ 43.) Accordingly, Plaintiffs have pled that Cablevision and MSGN satisfied their contractual obligations to Plaintiffs, thereby defeating any claim that Plaintiffs suffered an injury to property by not receiving broadcasts of every Yankees baseball game played this season.

Requiring Plaintiffs to plead a property right to receive broadcasts of every Yankees baseball game played this season may seem, at first blush, overly burdensome. *See Sims*, 230 F.3d at 20; *Chance*, 143 F.3d 698; *see also Tarshis*, 211 F.3d at 35; *Lee*, 166 F.3d at 543. However, RICO has a very specific purpose and seeks to pre-vent unique forms of behavior. *See Attorney Gen. of Canada*, 268 F.3d at 107; *Procter & Gamble Co.*, 879 F.2d at 14; *see also Durante Bros. & Sons, Inc.*, 755 F.2d at 250. That purpose would not be furthered by permitting these Plaintiffs to allege nebulous property interests that may or may not have been damaged by Cablevision's inability to reach a contractual agreement with YES. This Court will not allow Plaintiffs to utilize RICO to pursue treble damage relief when those Plaintiffs have no clear right to the property they claim was injured.

Therefore, Plaintiffs have failed to allege that their business or property were injured by Cablevision's and MSGN's purported RICO violations. *See Attorney Gen. of Canada*, 268 F.3d at 107; *Commercial Cleaning Servs., L.L.C.*, 271 F.3d at 380; *De Falco*, 244 F.3d at 305. Their RICO claim is accordingly deficient. *See Sims*, 230 F.3d at 20; *Chance*, 143 F.3d at 701. Consequently, Plaintiffs "can prove no set of facts in support of . . . [their RICO] claim which would entitle . . . [them] to relief" and dismissal of that claim is appropriate. *Tarshis*, 211 F.3d at 35; *Lee*, 166 F.3d at 543.

### C. Plaintiffs' Tying Claim Fails and Must be Dismissed

Plaintiffs have also attempted to assert a tying claim against Cablevision and MSGN under the Sherman Antitrust Act. That claim is improperly pled and must similarly be dismissed.

■ Section One of the Sherman Antitrust Act ("Section One") prohibits all contracts, combinations and conspiracies that unreasonably restrain trade. 15 U.S.C. § 1 (1994); *see Standard Oil Co. v. United States*, 221 U.S. 1, 51, 56, 58–60, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Tying arrangements violate Section One and are *per se* illegal. *See Eastman Kodak Co. v. Image*

Tech. Servs., Inc., 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 10, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *United States v. IBM,* 163 F.3d 737, 738 (2d Cir.1998); *see also Bogan v. Hodgkins,* 166 F.3d 509, 514 (2d Cir.1999); *Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 56 (2d Cir.1997).

■ Illegal trying arrangements arise when parties condition the sale of one product (tying product) on the purchase of another product (tied product) that the buyer does not wish to purchase, wishes to purchase from another source or wishes to purchase on different terms. *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 12, 104 S.Ct. 1551; *Virgin Atl. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 270 (2d Cir.2001); *Hack v. President & Fellows of Yale College,* 237 F.3d 81, 85 (2d Cir.2000), *cert. denied,* — U.S. —, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). Tying arrangements are only illegal if: (1) the seller has appreciable economic power in the tying product market; and (2) the arrangement affects a substantial amount of interstate commerce in the tied product market. *Eastman Kodak Co.,* 504 U.S. at 462, 112 S.Ct. 2072; *IBM,* 163 F.3d at 738 n. 1; *see Hack,* 237 F.3d at 85. Tying arrangements are illegal because they permit sellers to foreclose competition on the merits of the tied product by abusing market power in the tying product. *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 12, 104 S.Ct. 1551; *see Eastman Kodak Co.,* 504 U.S. at 464 n. 9, 112 S.Ct. 2072.

■ Tying arrangements that force buyers to purchase tied products they would not have otherwise bought from anyone else in the tied product market may not be illegal. *Jefferson Parish*

*Hosp. Dist. No. 2,* 466 U.S. at 16, 104 S.Ct. 1551; *see Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.,* 880 F.2d 1514, 1518 (2d Cir.1989); *United Magazine Co. v. Murdoch Magazines Distrib.,* 146 F.Supp.2d 385, 400 (S.D.N.Y.2001). Such trying arrangements may not violate Section One because they may not adversely impact competition in the tied product market. *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 16, 104 S.Ct. 1551; *Gonzalez,* 880 F.2d at 1518; *United Magazine Co.,* 146 F.Supp.2d at 400. Those arrangements may not adversely affect competition in the tied product market because no competition in that market is foreclosed if there was no original demand for the allegedly tied product. *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 16, 104 S.Ct. 1551; *Gonzalez,* 880 F.2d at 1518; *United Magazine Co.,* 146 F.Supp.2d at 400. Accordingly, tying arrangements that require buyers to purchase tied products they would not have purchased at all may be permissible. *See Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 16, 104 S.Ct. 1551; *Gonzalez,* 880 F.2d at 1518; *United Magazine Co.,* 146 F.Supp.2d at 400.

■ To state prima facie tying claims, plaintiffs must allege: (1) two separate and distinct products;[10] (2) actual coercion by the seller that forces the buyer to take the tied product; (3) seller's market power in the tying product or the ability to force the buyer to take the tied product; (4) anticompetitive effects in the tied product market; and (5) more than an insubstantial amount of interstate commerce affected by the tying arrangement in the tied product market. *Hack,* 237 F.3d at 86; *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d

10. Products are separate and distinct if there is sufficient customer demand for each product individually that manufacturers can efficiently provide both independently. *See East-*

*man Kodak Co.,* 504 U.S. at 462, 112 S.Ct. 2072; *Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 21–22, 104 S.Ct. 1551.

65, 70 (2d Cir.1996); *Suburban Propane, Div. of Nat'l Distillers & Chem. Corp., v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

Plaintiffs allege that Cablevision tied the receipt of MSGN services to unwanted premium Cablevision channels.[11] (Am. Compl.¶¶ 23–26.) Plaintiffs explicitly pled, however, that Cablevision subscribers may obtain MSGN separately from those premium channels on comparable terms. (Am.Compl.¶ 25.)

■ Construing the facts and inferences in their favor, *see Wall,* 18 Fed. Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, Plaintiffs have pled that: (1) MSGN programming and premium channels are separate and distinct products;[12] (2) any alleged tying arrangement would affect more than an insubstantial amount of interstate commerce in the premium channel market; (3) Cablevision or MSGN have market power in an undefined market that may permit those companies to force Cablevision subscribers to sign up for premium services; and (4) the alleged tying arrangement has had anti-competitive effects in the premium channel market. *See Hack,* 237 F.3d at 86; *De Jesus,* 87 F.3d at 70; *Suburban Propane, Div. of Nat'l Distillers & Chem. Corp.,* 953 F.2d at 788. Even if the facts and inferences are construed in the light most favorable to them however, *see Wall,* 18 Fed.Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, Plaintiffs have not pled that Cablevision or MSGN actually forces Cablevision subscribers to sign up for premium Cablevision services in order to receive MSGN. *See Hack,* 237 F.3d at 86; *De Jesus,* 87

F.3d at 70; *Suburban Propane, Div. of Nat'l Distillers & Chem. Corp.,* 953 F.2d at 788.

Plaintiffs' suggestion that Cablevision economically coerces its subscribers to sign up for premium service in order to receive MSGN is directly undermined by Plaintiffs' admission that Cablevision subscribers may obtain MSGN independently of those premium stations on reasonably comparable terms. Plaintiffs did not plead that Cablevision forbids subscribers from receiving MSGN separately from premium channels. *See Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 12, 104 S.Ct. 1551; *Virgin Atl. Airways Ltd.,* 257 F.3d at 270; *Hack,* 237 F.3d at 85. Nor did Plaintiffs plead that Cablevision requires subscribers to take premium channels in order to receive MSGN. Accordingly, Plaintiffs have failed to allege that Cablevision and MSGN force subscribers to accept premium channels in order to receive MSGN, and their tying claim is deficient.

Moreover, Plaintiffs have alleged that they did not wish to receive any of the allegedly tied premium channels to which they subscribed. (Am.Compl.¶ 24.) That allegation may be fatal to Plaintiffs' claim, because Cablevision may not have foreclosed competition on the merits in the premium channel market if Plaintiffs did not seek to obtain those premium channels elsewhere or on different terms. *See Jefferson Parish Hosp. Dist. No. 2,* 466 U.S. at 16, 104 S.Ct. 1551; *Gonzalez,* 880 F.2d at 1518; *United Magazine Co.,* 146 F.Supp.2d at 400.

Accordingly, Plaintiffs have failed to allege they were forced to accept premium

---

**11.** Plaintiffs failed to allege which product is the tying product and which product is the tied product. However, the Court presumes that MSGN is the tying product and that premium channels are the tied product.

**12.** The Court accepts that proposition with minimal inquiry or analysis because, by Plaintiffs' own admission, Cablevision customers may separately and independently subscribe to MSGN and premium channels.

channels in order to receive MSGN. Therefore, they have not pled a prima facie tying claim and their Amended Class Action Complaint is legally deficient. *See Sims,* 230 F.3d at 20; *Chance,* 143 F.3d at 701. Plaintiffs consequently " 'can prove no set of facts in support of ... [their tying] claim which would entitle ... [them] to relief' " and that claim must be dismissed. *Tarshis,* 211 F.3d at 35 (internal citations omitted); *Lee,* 166 F.3d at 543.

### D. Plaintiffs have Failed to Properly Allege Monopolization or Attempted Monopolization

Plaintiffs have also alleged actual and attempted monopolization claims. Plaintiffs pled those claims inadequately, however, and those claims must be dismissed.

Section Two of the Sherman Antitrust Act ("Section Two") forbids any combination or conspiracy to monopolize or attempt to monopolize interstate or international commerce. 15 U.S.C. § 2. To state claims for actual monopolization, plaintiffs must plead that the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully and improperly acquired or maintained that monopoly power. *Eastman Kodak Co.,* 504 U.S. at 481, 112 S.Ct. 2072; *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 97 (2d Cir.1998). Market dominance obtained through superior competition or historic accident is not legally actionable. *Eastman Kodak Co.,* 504 U.S. at 481, 112 S.Ct. 2072; *Grinnell Corp.,* 384 U.S. at 571, 86 S.Ct. 1698; *Tops Mkts., Inc.,* 142 F.3d at 97.

Monopoly power, which is virtually synonymous with market power, is the ability to control prices or exclude competition. *Eastman Kodak Co.,* 504 U.S. at 481, 112 S.Ct. 2072; *Bonded Concrete, Inc. v. D.A. Collins Constr. Co.,* No.

01–7682, 29 Fed.Appx. 725, 726–27, 2002 WL 284878, 2002 U.S.App. LEXIS 3157, at *2–3 (2d Cir. Feb. 25, 2002); *Virgin Atl. Airways Ltd.,* 257 F.3d at 267. Plaintiffs may allege monopoly power by pleading: (1) power to control prices or exclude competition; or (2) possession of a predominant share of the relevant market. *See Grinnell Corp.,* 384 U.S. at 571, 86 S.Ct. 1698; *Bonded Concrete, Inc.,* 29 Fed.Appx. at 726, 2002 WL 284878, 2002 U.S.App. LEXIS 3157, at *2; *Tops Mkts., Inc.,* 142 F.3d at 98. Courts only infer monopoly power based on predominant market share after considering other relevant factors, such as competitive levels within the relevant market, entry barriers to the relevant market, the nature of the anticompetitive conduct at issue and the elasticity of consumer demand. *See Tops Mkts., Inc.,* 142 F.3d at 98.

To state Section Two attempted monopolization claims, plaintiffs must plead: (1) anticompetitive or predatory conduct; (2) specific intent to monopolize; and (3) dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d 124, 134 n. 5 (2d Cir.2001); *Virgin Atl. Airways Ltd.,* 257 F.3d at 266. To allege a dangerous probability of achieving monopoly power, plaintiffs must plead that defendants possess a sufficient share of the relevant market. *AD/SAT v. Assoc. Press,* 181 F.3d 216, 226 (2d Cir.1999); *Twin Labs., Inc. v. Weider Health & Fitness,* 900 F.2d 566, 570 (2d Cir.1990); *see Tops Mkts., Inc.,* 142 F.3d at 100. Courts also consider factors such as strength of competition in the relevant market, entry barriers to the relevant market and probable market development to determine if there is a dangerous probability that defendants will achieve monopoly power.

*Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884; *AD/SAT,* 181 F.3d at 226–27; *see Twin Labs., Inc.,* 900 F.2d at 570.

■ To plead both actual and attempted monopolization claims, plaintiffs must allege the scope and boundaries of the relevant market sought to be monopolized. *See Spectrum Sports,* 506 U.S. at 455, 113 S.Ct. 884; *Eastman Kodak Co.,* 504 U.S. at 481–82, 112 S.Ct. 2072; *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 177, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). To define the relevant market, plaintiffs must allege the relevant geographic and product markets. *See AD/SAT,* 181 F.3d at 226.

■ The relevant product market is comprised of products which are generally interchangeable or for which there is cross-elasticity of demand. *See Eastman Kodak Co.,* 504 U.S. at 481–82, 112 S.Ct. 2072; *Todd v. Exxon Corp.,* 275 F.3d 191, 200 (2d Cir.2001); *Hack,* 237 F.3d at 86–87; *see Bogan v. Hodgkins,* 166 F.3d 509, 516 (2d Cir.1999). The relevant geographic market is that area where purchasers may practically turn for the goods comprising the relevant product market or that area where producers of the relevant product effectively compete. *See Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 331–32, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); *United States v. Eastman Kodak Co.,* 63 F.3d 95, 104 (2d Cir.1995); *see also United States v. Waste Mgmt., Inc.,* 743 F.2d 976, 979 (2d Cir.1984).

■ Determining the relevant market is a highly fact intensive process that may render dismissal for failure to state a claim or summary judgment improper. *Todd,* 275 F.3d at 199–200; *see Eastman Kodak Co.,* 504 U.S. at 482, 112 S.Ct. 2072. "There is, however, no absolute rule against ... [dismissing] antitrust claims for failure to allege a relevant product market." *Todd,* 275 F.3d at 200.

**1. Claim for Actual Monopolization**

Plaintiffs allege that MSGN has actually monopolized Yankees baseball broadcast rights and that Cablevision and MSGN have conspired to preserve and abuse that monopoly position. (Am.Compl.¶¶ 21, 23.) Plaintiffs also allege that Cablevision has actually monopolized the provision of cable television services and that MSGN and Cablevision have conspired to use that monopoly position to disadvantage MSGN's and Cablevision's competitors. (Am. Compl.¶¶ 33–34.) Neither allegation adequately states a claim.

■ Construing the facts and inferences in their favor, *see Wall,* 18 Fed. Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, Plaintiffs have alleged that both Cablevision and MSGN have monopoly power and that they maintained that power improperly. *See Eastman Kodak Co.,* 504 U.S. at 481, 112 S.Ct. 2072; *Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. 1698; *Tops Mkts., Inc.,* 142 F.3d at 97. However, Plaintiffs have not alleged what the relevant market is in which Cablevision and MSGN purportedly maintain that monopoly power. *See Eastman Kodak Co.,* 504 U.S. at 481–82, 112 S.Ct. 2072; *Grinnell Corp.,* 384 U.S. at 570–71, 86 S.Ct. 1698; *Tops Mkts., Inc.,* 142 F.3d at 97; *see also Spectrum Sports,* 506 U.S. at 455, 113 S.Ct. 884; *Walker Process Equip., Inc.,* 382 U.S. at 177, 86 S.Ct. 347.

Plaintiffs' failure to allege the scope and boundaries of the relevant market is more than a mere oversight. It severely hampers Cablevision's and MSGN's ability to answer the Amended Class Action Complaint and renders Plaintiffs' actual monopolization claim legally deficient. *See Sims,* 230 F.3d at 20; *Chance,* 143 F.3d at 701. Accordingly, Plaintiffs " 'can prove no set of facts in support of ... [their monopolization] claim which would entitle

. . . [them] to relief,' " and that claim must be dismissed. *See Tarshis,* 211 F.3d at 35 (internal citations omitted); *Lee,* 166 F.3d at 543; *see also Todd,* 275 F.3d at 200.

## 2. Attempted Monopolization Claim

■ Generously viewed, Plaintiffs have also alleged that Cablevision and MSGN conspired and attempted to monopolize the premium channel market on Cablevision's cable television system. (Am. Compl.¶¶ 23–25.) That claim is deficiently pled, however, and must also be dismissed.

Plaintiffs have alleged that Cablevision and MSGN engaged in anticompetitive conduct in furtherance of their purported conspiracy by tying MSGN to the receipt of premium channels. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884; *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d at 134 n. 5; *Virgin Atl. Airways Ltd.,* 257 F.3d at 266. Plaintiffs failed to allege, however, that Cablevision or MSGN specifically intended to monopolize the premium channel market or that there was a dangerous possibility that Cablevision or MSGN would achieve monopoly power in that market. *See Spectrum Sports,* 506 U.S. at 456, 113 S.Ct. 884; *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d at 134 n. 5; *Virgin Atl. Airways Ltd.,* 257 F.3d at 266. Moreover, Plaintiffs never even alleged what Cablevision's or MSGN's market share was in the premium channel market. Finally, Plaintiffs failed to fully define the premium channel market and did not delineate which channels it contains in particular geographic areas. *See Spectrum Sports,* 506 U.S. at 455, 113 S.Ct. 884; *Eastman Kodak Co.,* 504 U.S. at 481–82, 112 S.Ct. 2072; *Walker Process Equip., Inc.,* 382 U.S. at 177, 86 S.Ct. 347; *see also AD/ SAT,* 181 F.3d at 226.

Plaintiffs' oversights render their attempted monopolization claim legally deficient. *See Sims,* 230 F.3d at 20; *Chance,*

143 F.3d at 701. Those claims must therefore be dismissed. *See Tarshis,* 211 F.3d at 35; *Lee,* 166 F.3d at 543.

## E. Plaintiffs' Vertical Group Boycott Claim Must be Dismissed

Plaintiffs have also alleged a vertical group boycott claim against Cablevision and MSGN. Even if the facts and inferences are construed in Plaintiffs' favor, *see Wall,* 18 Fed.Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, that claim is defectively pled and must be dismissed.

■ Section One prohibits group boycotts or concerted refusals to deal. *See generally NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133–34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). Group boycotts, or concerted refusals to deal, are conscious, conspiratorial embargos by one group of market participants of another group of market participants. *See Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 212, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).

■ Horizontal group boycotts are agreements among competitors within the same market tier not to deal with other competitors or market participants. *See United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Bogan,* 166 F.3d at 516; *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.1978). Horizontal group boycotts are *per se* illegal. *Discon, Inc.,* 525 U.S. at 135, 119 S.Ct. 493; *Primetime 24 Joint Venture v. NBC,* 219 F.3d 92, 102 (2d Cir.2000); *see Bogan,* 166 F.3d at 514.

■ Vertical refusals to deal are agreements among persons or organizations at different levels of the market structure not to deal with other market participants. *See Topco Assocs., Inc.,* 405 U.S. at 608, 92 S.Ct. 1126; *Oreck Corp.,* 579 F.2d at 131; *Commercial Data Ser-*

vers, Inc. v. IBM, No. 00 Civ. 5008, 2002 WL 1205740, **2–3, 2002 U.S. Dist. LEXIS 5600, at *7 (S.D.N.Y. March 15, 2002). Vertical group boycotts that do not involve minimum price fixing (resale price maintenance) are subject to rule of reason analysis.[13] See Discon, Inc., 525 U.S. at 136, 138, 119 S.Ct. 493; Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 724–26, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1059–60 (2d Cir.1996); see also Cont'l T.V. v. GTE Sylvania, 433 U.S. 36, 57–58, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

 To state Section One group boycott claims, plaintiffs must allege an impermissible agreement among legally distinct entities that constitutes an unreasonable restraint of trade. See Primetime 24 Joint Venture, 219 F.3d at 103; AD/SAT, 181 F.3d at 232; Capital Imaging Assocs., P.C., 996 F.2d at 542; see also Bogan, 166 F.3d at 515; Tops Mkts., Inc., 142 F.3d at 96. Parents and their wholly owned subsidiaries are not legally distinct for Section One's purposes. Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984); Capital Imaging Assocs., P.C., 996 F.2d at 542; Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 201 F.Supp.2d 236, 274–75 (S.D.N.Y.2002); A & E Prods. Group L.P. v. Accessory Corp., No. 00 Civ. 7271, 2001 WL 1568238, *5, 2001 U.S.Dist. LEXIS 20245, at *14 (S.D.N.Y. Dec. 7, 2001).

 To state antitrust claims subject to rule of reason analysis, plaintiffs must first plead that defendants' challenged conduct had " 'an actual adverse effect on competition as a whole in the relevant market.' " Virgin Atl. Airways Ltd., 257 F.3d at 264 (quoting Capital Imaging Assocs., 996 F.2d at 543); CDC

Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 80 (2d Cir.1999); Tops Mkts., Inc., 142 F.3d at 96. If plaintiffs satisfy that requirement, the burden then shifts to defendants to show that the challenged conduct has pro-competitive effects or virtues. Virgin Atl. Airways Ltd., 257 F.3d at 264; CDC Techs., Inc., 186 F.3d at 80 n. 4; Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 56 (2d Cir.1997). If defendants meet that challenge, plaintiffs then bear the ultimate burden of showing that defendants could achieve those same pro-competitive effects in a less restrictive manner. Virgin Atl. Airways Ltd., 257 F.3d at 264; CDC Techs., Inc., 186 F.3d at 80 n. 4; Clorox Co., 117 F.3d at 56.

 Plaintiffs may satisfy their initial rule of reason burden by pleading actual adverse relevant market effects such as reduced output, increased prices, decreased quality, or the imposition of entry barriers. See Virgin Atl. Airways Ltd., 257 F.3d at 264; CDC Techs., Inc., 186 F.3d at 80; Tops Mkts., Inc., 142 F.3d at 96. Alternatively, plaintiffs may satisfy their initial burden by alleging that defendants possess market power, and thereby have the ability to impede competition in the relevant market. CDC Techs., Inc., 186 F.3d at 81; Tops Mkts., Inc., 142 F.3d at 96; K.M.B. Warehouse Distribs. v. Walker Mfg. Co., 61 F.3d 123, 128–29 (2d Cir.1995).

 For several reasons, Plaintiffs have improperly pled that Cablevision and MSGN conspired to exclude YES from Cablevision's basic tier programming. (Am.Compl.¶¶ 29–32.) First, Plaintiffs allege that MSGN is owned and managed by Cablevision. (Am.Compl.¶ 12.) That allegation, when taken in the context of the entire Amended Class Action Complaint,

---

**13.** Vertical minimum price fixing remains *per se* illegal, while vertical maximum price fixing is subject to rule of reason analysis. *State Oil* Co. v. Khan, 522 U.S. 3, 10–11, 18–19, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997).

suggests that MSGN is merely Cablevision's alter ego. Accordingly, Plaintiffs have effectively pled that Cablevision and MSGN are a sole entity, and have consequently failed to alleged that MSGN is legally distinct from Cablevision. *See Primetime 24 Joint Venture*, 219 F.3d at 103; *AD/SAT*, 181 F.3d at 232; *Capital Imaging Assocs., P.C.*, 996 F.2d at 542; *see also Bogan*, 166 F.3d at 515; *Tops Mkts., Inc.*, 142 F.3d at 96. That failure alone renders Plaintiffs' vertical group boycott claim legally deficient. *See Copperweld Corp.*, 467 U.S. at 771, 104 S.Ct. 2731; *Capital Imaging Assocs., P.C.*, 996 F.2d at 542; *Geneva Pharms. Tech. Corp.*, 201 F.Supp.2d at 274–75; *A & E Prods. Group L.P.*, 2001 WL 1568238, *5, 2001 U.S. Dist. LEXIS 20245, at *14.

 Secondly, Plaintiffs did not satisfy their initial rule of reason burden. Specifically, Plaintiffs have not pled the scope or boundaries of the relevant market from which Cablevision and MSGN are alleged to have excluded YES. *See Virgin Atl. Airways Ltd.*, 257 F.3d at 264; *CDC Techs., Inc.*, 186 F.3d at 80; *Tops Mkts., Inc.*, 142 F.3d at 96. That omission impermissibly handicaps Cablevision's and MSGN's ability to answer Plaintiffs' claim and renders Plaintiffs' vertical group boycott allegation defective. *See* DISCUSSION Sec. D., *supra.*

Moreover, Plaintiffs did not allege that Cablevision's and MSGN's alleged boycott activities raised Cablevision subscription prices or decreased the overall quality of Cablevision programming. *See Virgin Atl. Airways Ltd.*, 257 F.3d at 264; *CDC Techs., Inc.*, 186 F.3d at 80; *Tops Mkts., Inc.*, 142 F.3d at 96. Plaintiffs have merely alleged that YES has been treated differently than MSGN, which says nothing about price or quality. *See Virgin Atl. Airways Ltd.*, 257 F.3d at 264; *CDC Techs., Inc.*, 186 F.3d at 80; *Tops Mkts., Inc.*, 142 F.3d at 96.

Finally, even if the inferences are construed in their favor, *see Wall*, 18 Fed. Appx. at 42, 2001 WL 1019499, 2001 U.S.App. LEXIS 19881, at *4, Plaintiffs have not alleged that Cablevision's or MSGN's alleged YES boycott reduced Cablevision output or erected entry barriers to the relevant market. *See Virgin Atl. Airways Ltd.*, 257 F.3d at 264; *CDC Techs., Inc.*, 186 F.3d at 80; *Tops Mkts., Inc.*, 142 F.3d at 96. To claim that Cablevision or MSGN reduced output or erected entry barriers, Plaintiffs would had to have first defined the relevant market. Without that definition: (1) it is unclear which product's output may have been impermissibly reduced (Yankees baseball broadcasts or Cablevision cable television services); and (2) it is uncertain what market has been denied to YES (Cablevision cable television or some other theoretical market). The Court will not speculate what Plaintiffs intended the relevant market to be and will not require Cablevision and MSGN to read Plaintiffs' minds to divine the same.

Accordingly, Plaintiffs have not pled a legally viable vertical group boycott claim on which they are entitled to discovery. *See Sims*, 230 F.3d at 20; *Chance*, 143 F.3d at 701. Therefore, Plaintiffs " 'can prove no set of facts in support of ... [their vertical group boycott] claim which would entitle ... [them] to relief,' " and that claim must be dismissed. *See Tarshis*, 211 F.3d at 35 (internal citations omitted); *Lee*, 166 F.3d at 543; *see also Todd*, 275 F.3d at 200.

## F. Plaintiffs' State Law Claims

The Court declines to address Plaintiffs' State law claims because it has chosen to dismiss Plaintiffs' federal claims. Those State law claims are accordingly dismissed.

## G. Cablevision's and MSGN's Rule 11 Motion Against Plaintiffs' Attorneys

Cablevision and MSGN have moved for the imposition of Rule 11 sanctions on Plaintiffs' attorneys. Cablevision's and MSGN's sanctions motion is denied in light of the above and of the changes in the parties' positions, all of which occurred after Plaintiffs' served and filed the Amended Class Action Complaint.

## CONCLUSION

Cablevision's and MSGN's Cross–Motion to Dismiss Plaintiffs' Amended Class Action Complaint is GRANTED. Plaintiffs' remaining State law claims are similarly DISMISSED. Cablevision's and MSGN's sanctions motion is DENIED.

SO ORDERED.